## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 21-CR-160-1 (TJK) |
| v. | : | 18 U.S.C. § 231(a)(3) |
| CHRISTOPHER KUEHNE, | : |  |
| Defendant. | : |  |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Christopher Kuehne, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.   The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.   On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3.   On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday,

November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.    As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 PM, the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed the USCP's ability to perform their federally protected function to protect the U.S. Capitol building and its occupants.

5.    Shortly before 1:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties.

6.    At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The crowd was not lawfully authorized to enter or remain in the building and, prior to

entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.  The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.8 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

8.      At the time of the offense, defendant Christopher Kuehne was associated with the Kansas City chapter of the Proud Boys.  The Proud Boys described itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists."  Proud Boys members routinely attended rallies, protests, and other events, some of which resulted in violence involving members of the group.

9.      Beginning in or around December of 2020, the defendant and others affiliated with the Kansas City Proud Boys, including co-defendants William Chrestman, Ryan Ashlock, and

Louis Enrique Colon, began making plans to travel to Washington, D.C. to attend a publicly announced rally in support of then-President Trump, coinciding with Congress' certification of the Electoral College vote.

10. To coordinate their trip, individuals in the group sent electronic communications to each other which included discussions about engaging in violence with "Antifa" and "BLM," obtaining/bringing two-way radios, medical supplies, and other equipment, and concealing their identities. Chrestman and another member of the group discussed what types of weapons were lawful to possess in Washington, D.C. The defendant sent, among other messages, the following message regarding a potential confrontation with Antifa and BLM: "Be prepared not only to beat down but when you do action of violence so utterly massive that we send a message."

11. On January 4, the defendant traveled in a vehicle with other Kansas City Proud Boys, including co-defendants Ashlock and Colon, from the Kansas City area to Arlington, Virginia. Several occupants of the vehicle possessed firearms, including the defendant, who traveled with at least one AR-15 style rifle in a case with a lock. The defendant did not bring a firearm into Washington, D.C.

12. In the early morning of January 6, 2021, the defendant, along with co-defendants Chrestman, Colon, and Ashlock, and others, traveled from Arlington, Virginia, to Washington, D.C., where they met with a large group of Proud Boys at the Washington Monument. Along the way, co-defendants Felicia Konold and Cory Konold joined their group. The defendant was wearing a ballistic helmet and carrying protective gloves.

13. After joining with the larger Proud Boys group, the defendant marched with them across the National Mall and in the streets near the U.S. Capitol while shouting, among other things, "Whose streets? Our streets!" The defendant and the group ultimately made their way to

the west side of the Capitol's grounds, outside of the restricted, fenced-off perimeter made up of barricades guarded by uniformed USCP officers. At that location, the Proud Boys group and other individuals gathered outside the barricades, where some members of the group chanted phrases including "Whose Capitol? Our Capitol!"

14.     Shortly before 1:00 p.m., members of the crowd breached the line of barriers and surged toward the Capitol building. The defendant, along with other Proud Boys with whom he had been marching, moved forward as part of the crowd following this initial breach. The force of the crowd's combined numbers caused the USCP officers stationed at the barricades to retreat toward the Capitol building, allowing the defendant and others to move past multiple lines of barricades and ultimately make their way onto the Capitol's Lower West Plaza, inside the restricted area.

15.     For more than one hour, the defendant remained on the west front of the Capitol. Throughout that time, USCP officers (eventually joined by D.C. Metropolitan Police Department officers) tried unsuccessfully to control the crowd and expel it from the restricted area by, among other things, giving verbal orders to disperse, forming police lines, and deploying crowd-control measures including less-lethal munitions. Notwithstanding these police actions, the defendant failed to leave the area. Instead, the defendant remained unlawfully on the restricted Capitol grounds and, as time went on, made his way closer to the Capitol building, which officers were attempting to defend.

16.     Eventually, the defendant reached the base of the Capitol building and made his way onto the Upper West Terrace. By then, other members of the crowd had forcibly breached the building by breaking windows next to the Senate Wing Door. Numerous members of the crowd began funneling into the building, including the defendant, who — along with others from

the Proud Boys marching group — entered through the Senate Wing Door, next to the broken windows, at approximately 2:25 p.m., roughly twelve minutes after the initial breach.

17. Once inside, the defendant and others, including co-defendants Chrestman, Colon, Felicia Konold, and Cory Konold, moved about the building and made their way to the Crypt. Several USCP officers in that area, badly outnumbered by members of the crowd, began running away and positioned themselves on the opposite side of a large, sliding-door style metal barrier that was being lowered from overhead. Members of the crowd pursued the officers and successfully stopped the door from closing by placing chairs and a trash can in its path. Several feet from, and directly in front of, of the defendant, police attempted to close the door and repel the rioters, who were throwing objects and spraying chemical irritants at police. Ultimately the rioters prevailed, and the officers retreated further into the building.

18. After the officers had fled, the defendant and others he was with — including co-defendants Chrestman and Colon — took steps to ensure the metal door would remain open, thereby preserving the crowd's ability to move unlawfully about the building. In particular, after another Proud Boys member moved a portable lectern toward the door, the defendant and that individual positioned the lectern in the path of the sliding door, where it would block the door from closing.

19. After using the lectern to obstruct the barrier, the defendant and others progressed into the Capitol Visitor Center. After a short time in the building, the defendant returned to the Senate Wing Door and left the building. While he was inside, the defendant helped pick up trash that was strewn on the floor.

20. After the events of January 6, 2023, the defendant deleted materials from his phone including messages with Chrestman and Colon, as well as a Kansas City Proud Boys Telegram

chat.. The defendant also contacted co-defendants Chrestman and Colon and requested that they delete any prior conversations with him.

### *Elements of the Offense*

21.    The parties agree that Obstruction of Law Enforcement During Civil Disorder, in violation of Title 18 U.S.C. §§ 231(a)(3), requires the following elements:

    a.  That the defendant knowingly committed an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

    b.  That, at the time of the defendant's act, the law enforcement officers were engaged in the lawful performance of their official duties incident to and during a civil disorder, as that term is defined at 18 U.S.C. § 232(1), that is, "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."

    c.  That the civil disorder in any way or degree obstructed, delayed, or adversely affected commerce or the conduct or performance of any federally protected function as that term is defined at 18 U.S.C. § 232(3), that is, "any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof."

### *Defendant's Acknowledgments*

22.    The defendant knowingly and voluntarily admits to all the elements as set forth above.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    *s/ Conor Mulroe*
CONOR MULROE
Trial Attorney
U.S. Department of Justice,
  Criminal Division
1301 New York Ave. NW
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, Christopher Kuehne, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: __27 July 2023__

_____
Christopher Kuehne
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: __7·27·23__

_____
Marina Medvin
Attorney for Defendant