**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-160-1 (TJK)** |
| **CHRISTOPHER KUEHNE** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Christopher Kuehne to 6 months in custody, 3 years of supervised release, restitution in the amount of $2,000, and the mandatory special assessment of $100.

## I.      INTRODUCTION

The defendant, Christopher Kuehne, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Kuehne, a U.S. Marine Corps veteran, coordinated with other Kansas City Proud Boys in preparation to inflict "utterly massive" violence in Washington DC on January 6. Drawing upon his military experience, he helped the group increase its tactical effectiveness by using orange tape as covert insignia that allowed members of the Proud Boys marching group to recognize one another in the heat of conflict. Inside the Capitol building, he moved furniture to prop open a large door, thereby keeping open the path to other rioters and obstructing law enforcement's efforts to contain the mob. And afterward, he destroyed evidence and directed others in his group to do the same.

The government recommends that the Court sentence Kuehne to 6 months of incarceration for his conviction of violating 18 U.S.C. § 231(a)(3). A six-month sentence reflects the seriousness of Kuehne's conduct and provides adequate deterrence to Kuehne and others.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 198, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Kuehne's Role in the January 6, 2021 Attack on the Capitol

#### *Pre-planning*

In the leadup to January 6, Kuehne was a vocal advocate of violence. On January 3, in a planning chat with other Kansas City Proud Boys members and prospects, he told the group: "Be prepared not only to beat down but when you do action of violence so utterly massive that we send a message." Gov. Ex. 1 at 1. He later continued: "This is going to get kinetic quick. If a soy boy or girl wants to get it on they need to expect a hospital trip...its the only thing they understand."

2

*Id.* at 2. Kuehne followed the latter message with a statement about how he was "proud to be with patriots such as yourself and stand side by side with you. . . POYB!!" *Id.*

Kuehne drove with other members of the Proud Boys from the Kansas City area to the Washington, D.C. metro area. He brought at least one AR-15 style rifle with him on the trip.[2] The night of January 5, staying in a rented property with the group, Kuehne continued to encourage and instruct the others in tactical preparations for the activities of the next day. In particular, he stressed to another member of the group the importance of using a recognizable identifier, such as a "small piece of reflective tape," to allow members of the group to recognize one another and to distinguish "friendly from foe." Ex. 2 at 2-3. Kuehne explained that he appreciated the importance of such identification from having "trained and worked with Iraqi special forces." *Id.* at 3. Kuehne later would, in fact, provide orange tape to other members of his group for this purpose.

### Conduct on January 6

On the morning of January 6, Kuehne and the other Kansas City Proud Boys traveled into the District of Columbia and made their way to the national mall. He was wearing a ballistic helmet and carrying protective gloves, and other members of the group were similarly equipped. While en route, they encountered several people whom they invited to join them, including Felicia and Cory Konold (co-defendants in this case) and Robert Gieswein (who was charged separately and has since pleaded guilty to two counts of assaulting officers). Like Kuehne and others in his group, the newcomers were outfitted for violence: Gieswein in particular was carrying a baseball bat and wearing a military-style helmet and camouflage paramilitary kit. Upon joining with Kuehne and his cohort, these individuals donned pieces of Kuehne's orange tape.

---

[2] Two of Kuehne's co-defendants have reported that he brought two rifles.

Outfitted in their gear and marked with orange tape, Kuehne's group soon joined with a larger group of approximately 100 Proud Boys members and associates, then marched together from the Washington Monument to the Capitol Building, away from the planned speeches. *See* Gov. Ex. 3. In Government Exhibit 3, numerous members of the marching group can be seen wearing the orange tape that Kuehne brought and distributed.



*Still from Gov. Ex. 3 at 00:18 (Kuehne circled)*

They arrived at the First Street gate near Peace Circle just as Congress was preparing to begin the certification proceedings at 1:00 p.m., as required by law.

***Breach at Peace Circle***

Between Peace Circle and the Capitol building stood multiple lines of physical barricades, including bike racks and temporary "snow fencing," manned at various points by uniformed officers of the U.S. Capitol Police (USCP). At intervals on the barricades were posted signs reading "Area Closed" in large text.

Within minutes of the group's arrival at Peace Circle, certain members of the crowd crossed the first line of barricades, approached a line of USCP officers who were guarding a fence inside the restricted area, and began trying to force their way past the police line. Other members of the

crowd, including members of the Proud Boys, surged forward behind them. After members of the crowd toppled the barricades and sent police fleeing, Kuehne followed along with the crowd, stepping over the downed fence and progressing toward the Capitol building. With the rest of the crowd, he was briefly stopped by a black metal fence manned by officers, but other rioters soon broke through that barrier as well, and Kuehne moved with the rest of the crowd onto the lower west terrace.

### *Entry to the Building*

Kuehne remained on the west front of the Capitol for more than one hour, as members of the crowd fought with police and officers used crowd-control measures including projectiles and chemical irritants to try to repel the increasingly violent mob. Recognizing that he was committing a crime, Kuehne deactivated his phone's Wi-Fi and GPS. (Later, in a message that otherwise denied any wrongdoing, he would describe this act of concealment as "[o]ne of the first things I thought of.")

From: 1353989491 Chris K (owner)
To bad I had wifi off and GPS off on my phone. One of the first things I thought of. Regardless, I am not worried. I DID not enter the capital until I heard antifa and other talking about tearing it down or burning it down...the oath I took as a Marine never ended even when I retired. There is video of me cleaning and making other clean up trash as myself and a few other patriot pushed them out. Sure there might be other video of me...guelling a potentially hostile situation between ppl a nd what I knew to be antifa instigating. Then a cops including that LIEUTENANT shaking my hand in thanks. Brother. Truth is powerful. If I did anything but what I did...not the baseless BS the media is reporting I would never be able to look my wife and son in the eyes

Status: Sent
1/15/2021 12:51:19 AM(UTC+0)

Eventually, the crowd reached the building and forced entry by breaking windows. Kuehne, staying near other members of the Kansas City Proud Boys group, moved to the upper west terrace where he walked past a line of police in riot gear while others in the crowd chanted at the police, "you're on the wrong side!" *See* Ex. 4 at 00:18-00:22.

Kuehne then entered the building at the same place it was first breached, the Senate Wing Door, at approximately 2:25 PM, roughly twelve minutes after the initial breach.

At the time of Kuehne's entry, there were still parts of the building that had not yet been taken by rioters. The police, however, were continuously forced to retreat because of the rioters' overwhelming numbers, which allowed the crowd—including Kuehne and his Proud Boys companions—to progress further into the Capitol.

In particular, a group of rioters that included Kuehne and other Kansas City Proud Boys chased police officers out of the Crypt and into a passageway or lobby leading to the Capitol Visitor Center. Government Exhibit 5, which does not have sound, nonetheless shows the body language of the fleeing officers illustrating their urgency as they tried to escape to safety behind an overhead gate that was being lowered:



*Still from Ex. 5 at 00:16*

A clip of the same sequence from the viewpoint of a rioter, submitted here as Government Exhibit 6, provides additional perspective, including of the crowd throwing chairs at officers and shouting, "you're scared now, motherfucker!"

While the police were fleeing, several feet in front of Kuehne, a large metal door began lowering from the ceiling. The officers retreated behind the descending gate and tried to help it close while rioters tried to keep it open. Directly in front of Kuehne, rioters threw a trash can at the officers and attempted to slide pieces of furniture into the door's path, and Gieswein (still wearing the orange tape Kuehne had provided) sprayed a chemical at the officers.



*Still from Ex. 5 at 00:28*

Before long, the officers yielded, and the crowd (with Kuehne just a few people back) continued moving forward:



*Still from Ex. 5 at 00:45 (Kuehne circled)*

Although the officers had all fled, the door was still activated and continued to close. But Kuehne, together with Chrestman and another Kansas City Proud Boy, worked together to drag a movable podium into the path of the door, replacing a smaller chair that another rioter had placed there:



*Still from Ex. 5 at 01:29*

Kuehne and other rioters then moved into the Capitol Visitor Center, following in the wake of the fleeing police, and remained there for a short time until they learned that a shooting had taken place near the House floor, after which they returned to the Senate Wing Door and left the building.

### *Subsequent Actions*

In the days following January 6, Kuehne took steps to obstruct justice by destroying evidence of the crime he and his co-defendants had committed. He directed co-defendant Colon, "Delete all your messages and pics now," and he advised co-defendant Chrestman: "Keep a low profile...stop texting and sending stuff about it...your txt can be subpoena… I will talk in person but none on the phone or text...please delete our texts and start new ok?" And, consistent with his instructions to others, Kuehne deleted materials from his own phone. A forensic extraction showed that various messages on the phone had been deleted, including messages with Colon and Chrestman and messages about the reflective tape. *See, e.g.*, Gov. Ex. 2 ("yes" value in "Deleted" column for all messages). The pre-planning messages discussed above, in which Kuehne exhorted others to "massive" violence, were not found on his phone at all (the government's evidence of them came from Chrestman's phone).

Kuehne also indicated he was not yet done "fighting" as part of an organized force. On January 8, while messaging with another member of the Kansas City Proud Boys, he complained about one of their chaptermates: "I will never ever let him ride with me again and honestly I don't trust to fight with him next to me."

## III.    THE CHARGES AND PLEA AGREEMENT

On January 12, 2022, a federal grand jury returned a superseding indictment charging Kuehne and others with Conspiracy, in violation of 18 U.S.C. § 371; Obstruction of an Official

Proceeding, in violation of 18 U.S.C. § 1512(c)(2); Obstruction of Law Enforcement during a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); and Disorderly Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) On September 7, 2023, Kuehne was found guilty of Obstruction of Law Enforcement during a Civil Disorder based on a guilty plea entered pursuant to a plea agreement.

## IV.   STATUTORY PENALTIES

Kuehne now faces sentencing on one count of Obstruction of Law Enforcement during a Civil Disorder.

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the guidelines calculation set forth in the Presentence Report except for its application of a 2-level reduction to Kuehne's offense level because of his status as a "zero-point offender."[3]

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not considered at the time the parties entered

---

[3] The application of § 4C1.1 would have no effect on the advisory guideline range.

into the plea agreement.

One of the criteria for the application of Section 4C1.1 is that "the defendant did not use violence or credible threats of violence in connection with the offense." U.S.S.G. § 4C1.1(a)(3). That requirement is not met here. Kuehne was the most vocal advocate for violence in the Kansas City Proud Boys planning group ahead of January 6. Kuehne, whose combat experience made him a credible leader, told his soon-to-be accomplices that they needed to be ready to dole out "violence so utterly massive" and to send their perceived adversaries on "a hospital trip." As the Court will recall, one of Kuehne's co-defendants, William Chrestman, did then use and threaten violence at the Capitol, shoving against a fence being held by police and threatening to "take . . . out" officers who were using riot control munitions. *See* ECF 202 (Chrestman statement of offense); ECF 232 (government's sentencing memorandum as to Chrestman).

Moreover, Kuehne's conduct in the Crypt lobby sets him apart from other rioters who, unlike him, were mere passive observers of the violence against law enforcement on January 6. Kuehne, with accomplices, disabled one of the Capitol's physical security features just after watching police trying desperately to deploy it while under a barrage of thrown chairs and chemical spray. This context is important. As another sentencing court in this District has observed when analyzing Section 4C1.1:

> In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.

*United States v. Andrulonis*, no. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12. Assessing that

11

context, Judge Howell found defendant Andrulonis ineligible for the 4C1.1 reduction in part because he went "inside the Crypt where he saw rioters throwing chairs at U.S. Capitol Police officers as they were attempting to secure the door in the Crypt lobby." *Id* at 12-13. Kuehne was at that same scene, and he went further than Andrulonis, actively contributing to the "volatility" and "threat" by ensuring that the door would stay open after fellow rioters successfully repelled the police who were trying to close it.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[4]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 66. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 8, Kuehne's Guidelines

---

[4] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

imprisonment range is 0 to 6 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Kuehne's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Kuehne was near the front of the first wave of rioters to enter the Capitol grounds, and he was an early entrant into the building, where he took part in a joint effort to thwart law enforcement's attempts to control the crowd. After the fact, he took steps to obstruct justice by destroying evidence, which is a significant § 3553(a) factor even if Kuehne's plea agreement does not include an adjustment for obstruction of justice under U.S.S.G. § 3C1.1. In short, the nature and circumstances of Kuehne's offense were serious, and fully support the government's recommended sentence of six months of incarceration.

### B.  The History and Characteristics of the Defendant

A significant feature of Kuehne's biography is his military service. As the PSR notes, Kuehne had a lengthy career in the U.S. Marine Corps, during which he served in combat and received various awards and commendations. Kuehne's service and his sacrifice are to be applauded, and they are a favorable aspect of his history and characteristics.

However, Kuehne's military experience served to aggravate his offense conduct. As discussed above, Kuehne was an informal leader within his group, drawing upon the credibility

that comes with being a combat veteran. He made explicit reference to his military experience when he told other Proud Boys to be ready for extreme violence, as well as when he initiated the orange-tape signifier that promoted group cohesion in the chaos of the riot. Kuehne's military training made him a more effective and more dangerous participant in the joint criminal conduct that he and his cohort committed. And fundamentally, like all other military veterans who took part in the attack on the Capitol, Kuehne should have known better. He once took an oath to support and defend the Constitution, and his participation in the events of January 6 was in flagrant violation of that oath.

████████████████████████████████████

████████████████████████████████████

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Kuehne's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Kuehne also weighs heavily in favor of a significant term of incarceration.

An important factor in the Court's evaluation of specific deterrence is the degree to which a defendant has truly accepted responsibility — not just pleaded guilty to the elements of a crime, but demonstrated a belief that what he did was wrong and an understanding of *why* it was wrong.

Kuehne has apologized in a written statement that is quoted in the PSR. *See* PSR ¶ 51. But regrettably, the statement reveals that Kuehne has not fully accepted responsibility for his conduct. When addressing the harm that his crime caused, Kuehne acknowledges only the impact on himself

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

and his family. He makes no mention whatsoever of the injuries to persons and the damage to property that occurred on January 6, let alone the damage to the country's democratic institutions. Kuehne's purported statement of remorse largely seeks to minimize his own conduct. The only wrongdoing he appears to acknowledge is "his presence on the lawn after the crowd pushed forward." In a claim that strains credulity, he insists that he "only entered the Capitol Building to protect property that [he] believed was going to be destroyed by the crowd." And he says that he "refused to formally join the [Proud Boys] after seeing everything the PB members did at the Capitol," but his phone contained a deleted message from the night of January 6, after the riot had concluded, in which the sender told Kuehne "Congrats on the first degree," an apparent reference to the first level of formal Proud Boys initiation. If Kuehne received his "first degree" on the evening of January 6, that is not a disavowal of the group's conduct — it is a celebration.

Accordingly, a significant custodial sentence is necessary to impress upon Kuehne that it is unacceptable to engage in similar conduct in the future.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[8]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the government submits that helpful comparisons can be made to co-defendants who were part of the Kansas City Proud Boys planning group with Kuehne.

Kuehne should receive a sentence lower than Chrestman's and higher than Ashlock's. Clearly, his conduct at the Capitol was less egregious that that of Chrestman, who shouted a threat at officers, shoved against a manned barricade, repeatedly incited the crowd to "take your house back!," and pleaded guilty to more serious offenses (18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 115(a)(1)(B)). However, within the Kansas City Proud Boys planning group, Kuehne was the more influential voice, and he used his status as an informal leader to promote violence and enhance the group's structural coherence. It is telling that, after the fact, Kuehne told Chrestman to delete his messages, and not the other way around. Thus Chrestman's 55-month sentence, although far higher than what the government is requesting here, should nonetheless inform the Court's consideration as a point on the spectrum of culpability within the Kansas City cohort.

Ashlock, by contrast, exercised no leadership behind the scenes *or* on the ground. His conduct at the Capitol consisted largely of entering the restricted area, pulling aside an unmanned piece of fence, and, later, grasping a bike rack that was being pulled from the other side by police. Like Kuehne, Ashlock wore protective equipment in anticipation of violence. But unlike Kuehne, Ashlock did not take the meaningful step of entering the Capitol building. This is an important distinction between Kuehne and Ashlock, and one that should be reflected in their respective sentences. Ashlock received a sentence of 70 days' incarceration. Kuehne's greater culpability is reflected in his offense of conviction (a felony compared to Ashlock's misdemeanor), and it should likewise be reflected in his sentence.

The Court has also recently sentenced another two of Kuehne's co-defendants, Felicia Konold and Cory Konold. Felicia received a sentence of 45 days in prison (plus three months of

home confinement), and Cory received a sentence of 30 days in prison. These lower sentences are consistent with the Konolds' attenuated connection to the organizational structure that made the Proud Boys a force multiplier in the riot. Unlike the other co-defendants in this indictment, the Konolds simply tagged along with the Kansas City Proud Boys after meeting them by chance on the morning of January 6. But as discussed above, Kuehne not only was a part of that structure, he also embraced, encouraged, and enhanced its violent capabilities.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Kuehne must pay $2,000 in restitution, which reflects in part

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

the role he played in the riot on January 6.[10] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Kuehne's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.[11]

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 6 months in custody, 3 years of supervised release, restitution in the amount of $2,000, and the mandatory special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:        */s Conor Mulroe*
Conor Mulroe
NY Bar Number 5289640
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
(202) 330-1788
conor.mulroe@usdoj.gov

---

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[11] The government understands that the defendant has sought and received an order permitting early payment of restitution.