## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | CRIMINAL CASE NO: 1:21-CR-00160-TJK |
| ) | |
| ) | SENTENCING: FEBRUARY 23, 2024 |
| **CHRISTOPHER KUEHNE,** ) | |
| DEFENDANT. ) | |

## SENTENCING MEMORANDUM OF CHRISTOPHER KUEHNE

Christopher Kuehne is a 50-year-old father and husband, a 100% disabled Marine veteran who served multiple tours of duty and received a Purple Heart, and a hardworking family man with a pristine work ethic who started working at the age of 13. He maintains respectable employment to this day and has spent the past three years fully invested in higher education, obtaining a Master's Degree in Business Administration and now working on a second Master's in Human Resource Management.

Mr. Kuehne submits to the Court that one year of probation is the appropriate penalty for the non-violent first offense of *Impeding or Interfering with Law Enforcement During a Civil Disorder*.

Mr. Kuehne was part of the large crowd on January 6 that entered an area previously marked as restricted in front of the Capitol Building. He then entered the Capitol Building with the goal of stopping people from destroying property inside. Both CCTV and publicly available video corroborate that Mr. Kuehne cleaned trash while inside the building. Mr. Kuehne also

stopped an individual from stealing an item from the Capitol Building, stopped people from breaking items, made people clean up trash, and stopped a man from smoking marijuana in an office of the Capitol Building.

Mr. Kuehne accepted responsibility for his participation in the chaos on January 6 and pleaded guilty to a felony civil disorder offense. In good faith, and prior to sentencing, he prepaid the Government's requested restitution in the amount of $2,000.00— even though Mr. Kuehne had never laid a hand on Government property, nor committed any destruction or property damage whatsoever — instead, helping to preserve that property and helping to clean during the breach of the Capitol Building.

Considering the defendant's character, age, clean record, behavior in the Capitol Building and the facts of his case in the context of other January 6 cases and as contrasted to the Government's position on left-wing Capitol Building disruptors, and Mr. Kuehne's self-reformation post-January 6, probation for one year is an appropriate penalty for a defendant highly unlikely to re-offend.

The Defense submits the foregoing memorandum in support of Mr. Kuehne's position on sentencing factors.

## I. Christopher Kuehne, the Purple Heart Marine Veteran

Christopher Kuehne was born in Chicago, Illinois. He is the oldest brother to two younger sisters. He grew up as an active Boy Scout.

At the young age of 9, on Christmas Eve of 1981, he saved his 2-year-old sister from a burning vehicle. Chris alerted his mother that smoke was coming from the floor of the back seat of the car that she was driving. As his mother pulled over and rushed one of Chris' younger sisters to safety, Chris, who was left in the car with his other sister, removed himself and the toddler from the car by the time their mom came back for them. Minutes later, the car was engulfed in flames. The young Christopher was awarded "The Medal of Merit" by the National Court of Honor Boy Scouts of America for saving his sister's life, the second-highest life-saving award given by the Boy Scouts of America.



Sadly, his childhood was then tarnished. See PSR, ECF 234 at *16.

At age 13, he began working. His first job was to bus tables at a Greek-Italian restaurant. By age 16, he moved out of his family home and began to support himself, while continuing his high school education. He lived paycheck to paycheck, working three minimum-wage jobs, as well as staying in school — Chris worked as a lead smelter, working the night shift, doing his homework on breaks, and barely sleeping; but that wasn't enough to make ends meet, so he worked at Cracker Barrel three times a week as a grill cook and on the weekends he delivered pizzas.

In 1993, at the age of 19, Christopher Kuehne enlisted in the Marines. He spent a decade as a Staff Sergeant. During this time, he was selected as the top 1% of enlisted personnel in the Marine Corps to participate in the Marine Enlisted Commissioning Education Program (MECEP) to obtain a degree and commission as an Officer and Leader of the Marines.

By June of 2004, Second Lieutenant Chris Kuehne had the honor of giving the commands for the 21-Gun Salute at President Ronald Reagan's private funeral in Simi Valley, California.

 

Chris was deployed four times. Two of the deployments were for combat in Iraq, where he sustained life-altering injuries that rendered him 100% disabled.

In 2004, Christopher completed two back-to-back deployments to Fallujah. He served as a Platoon Commander in combat. In 2006, he was deployed for combat in Ramadi for a one-year tour as part of the Military Transition Team with the 7th Division of the Iraqi Army.

  

While serving in Ramadi, Iraq, Christopher sustained serious injuries. An ISIS suicide bomber detonated himself 25 feet from Christopher, throwing Chris from his position and causing him to land on his head. He lost consciousness for approximately 20 minutes while he was medically evacuated. He had brain fluid in his right hemisphere and injuries to his ear, neck, nose, and ribs. One of Chris' ribs had to be removed. He had to undergo an osteotomy, a turbinectomy, and a rhinoplasty to fix some of the damage caused by the explosion. He had full L5-S1 fusion with hardware to his spine and had a spinal cord stimulator implanted to relieve pain. He has to now permanently wear a hearing aid due to the ruptured eardrum. His left wrist is permanently injured. The impact of the blast resulted in traumatic brain injury, causing serious memory and cognitive issues; he was diagnosed with PTSD-TBI and post-concussion syndrome in 2007 and suffers serious migraines as a result. Chris also developed sleep apnea as a result of his injuries and requires the use of a CPAP machine.

Despite his injuries, from 2007 through 2010, Capt. Kuehne was assigned to the Marine Corps Barracks in Washington, D.C., as the Platoon Commander of Bravo Co. Marine Barracks 8th & I.[1] *This is a very prestigious position that fewer than one percent of Marines are able to obtain, and all candidates are hand-selected*. Christopher took part in the Friday Night Parade, also termed the Marine Corps Evening Parade, the Sunset Parade at Marine Corps Memorial, and was hand-selected for the wreath-laying ceremony at the Tomb of the Unknown Soldier in 2007. Capt. Kuehne also oversaw numerous ceremonial burial details at Arlington National Cemetery for deceased Service Members.





Capt. Kuehne finished his career as an adjutant and Company Commander of 1st Marine Headquarters Group (1MHG) and 9th Communications Battalion. Christopher Kuehne was honorably discharged after 20 years of service in 2013.

Christopher Kuhene's military awards include the Purple Heart, Navy and Marine Corps Commendation Medal ("V"), Navy and Marine Corps Commendation Medal (2), Navy and Marine Corps Achievement Medal

---

[1] Christopher Kuehne can be seen on pages 18 and 35 of the Marine Barracks' magazine, available at https://www.barracks.marines.mil/Portals/74/Pass in Review k/Pass in Review v/Volume 28 - Issue 1.pdf

("V"), and Navy and Marine Corps Achievement Medal (2), Combat Action Ribbon (Iraq), Navy Unit Commendation (4), Navy Meritorious Unit Commendations (2), Marine Corps Good Conduct Medal (2), National Defense Serice Medal (2), Iraq Campaign Medal (2), Global War on Terrorism Expeditionary Medal (Iraq), Global War on Terrorism Medal, Korean Defense Service Medal, Humanitarian Service Medal, Sea Service Deployment (4), Individual Certificate of Commendation (2), Meritorious Mast, Letter of Appreciation (7), Certificate of Appreciation, Rifle and Pistol Expert. *See* Defense Exhibit 1, *Military Awards, Certificates, and Letters*.

The injuries from Christopher Kuehne's military career that rendered him 100% disabled are permanent and life-altering. His treatment is ongoing. The list of current ailments and treatments is as follows:

- PTSD-TBI counseling and therapy, as well as daily prescription medications, for depression, anxiety, and mood regulation
- PTSD sleeplessness and nightmares with daily prescription medication to control for more severe sleeplessness and nightmares
- Botox injections and sumatriptan injections for constant and severe migraines resulting from the head injury and the PTSD-TBI
- Nerve block injections every six months for permanent neck injury
- Continued cognitive and speech therapy for traumatic brain injury-related memory lapses and cognitive disorder control
- Neurology appointments related to monitoring the traumatic brain injury-related hand tremors and suspected pre-Parkinson's Disease symptoms resulting from brain and spinal cord injuries
- Required daily use of CPAP machine at night for cardiothoracic injury and ENT injuries
- Surgically implanted L5-S1 Spinal cord stimulator for constant back pain
- Hearing aid in the left ear from permanent hearing damage
- Permanent damage to left wrist that required surgery and continuing treatment for the ongoing pain and discomfort
- Left and Right Knee Surgeries, ACL Repair and subsequent arthritis and surgeries — a total of 6 surgeries completed, with additional surgeries expected
- Severe arthritis in both hands with daily prescription medications for the arthritis
- Continuous back/shoulder surgeries (most recent a few months ago) required as a result of ongoing medical problems from the injuries and their resulting treatment

In 2014, Christopher married Annette. Together, they had a son named Christopher, after his father. Chris is the sole breadwinner of their household. Mr. Kuehne raises his son to be of benevolent character and urges him to commit himself to service to his country. The two Christophers are inseparable and do everything together.





*Christopher Kuehne and his mini-me.*

In the summer of 2020, amid the Covid pandemic, Christopher was laid off from his job. He was making ends meet by designing and building custom rifles. He was searching for a new direction, and, in November, he became interested in a local group that was supposed to help protect patriots from violent Antifa groups, a group known as the Proud Boys. In January of 2021, he traveled with the group to Washington, D.C., with the intention of confronting Antifa agitators. He did not become a member or pay dues to the group and instead disassociated from the Proud Boys group after January 6. He was arrested one month later for his participation in the events in and in front of the Capitol on January 6.

For the past three years, Mr. Kuehne has been reforming his life to bring himself back to a point of pride. He has been working on two master's degrees. He has already completed his Master of Business Administration with a 4.0 average in 2022, graduating Suma Cum Laude. He is now working on a Master of Human Resource Management degree and holds a 3.98 GPA.

Chris has also completed around 150 hours of community service during this time.

## II. JANUARY 6TH

In December 2020, the Kansas City Proud Boys began planning to go to D.C. for the scheduled January 6, 2021 protest events, in expectation of confrontations with BLM and Antifa[2], a neo-leftist group that was responsible for harassing conservative protesters throughout 2020 and who engaged with the Proud Boys during the November and December protest events in DC.[3] Four Proud Boy members were stabbed on the streets of D.C. when BLM and Antifa supporters conflicted with the Proud Boys on the evening of December 12, 2020[4], after thousands of Trump supporters gathered in Washington D.C.[5] For the January 6 events, as far as



---

[2] *See* ECF No. 132 at *4; ECF No. 198 at *4.

[3] *Amid protests, Trump says he will designate Antifa as terrorist organization*, REUTERS, (Jun. 1, 2020), https://www.reuters.com/article/idUSKBN2370MY; Seth G. Jones, *Who Are Antifa, and Are They a Threat?*, CENTER FOR STRATEGIC AND INTERNATIONAL STUDIES (Jun. 4, 2020), https://www.csis.org/analysis/who-are-antifa-and-are-they-threat; Press Release, *While Leading Fight To Hold Antifa Accountable For Violent Riots And Destruction, Sen. Cruz Calls Out Terror Group For Exploiting Peaceful Protests Honoring George Floyd*, TED CRUZ FOR U.S. SENATOR (Jun. 5, 2020), https://www.cruz.senate.gov/newsroom/press-releases/while-leading-fight-to-hold-antifa-accountable-for-violent-riots-and-destruction-sen-cruz-calls-out-terror-group-for-exploiting-peaceful-protests-honoring-george-floyd; Jonathan Turley, *Antifa and anarchists have hijacked Floyd protests but left won't admit it*, THE HILL (Jun. 2, 2020), https://thehill.com/opinion/civil-rights/500605-antifa-and-anarchists-have-hijacked-floyd-protests-but-left-wont-admit-it; Luke Mogelson, *In the Streets with Antifa*, THE NEW YORKER (Oct. 25, 2020), https://www.newyorker.com/magazine/2020/11/02/trump-antifa-movement-portland; Dan Noyes and Cornell Barnard, *Suspect arrested after free speech rally organizer assaulted in San Francisco, officials say*, ABC 7 NEWS (Oct. 20, 2020), https://abc7news.com/free-speech-rally-san-francisco-tech-protest-un-plaza-conservative/7164912; Katie Shepherd, *Portland police stand by as Proud Boys and far-right militias flash guns and brawl with antifa counterprotesters*, THE WASHINGTON POST (Aug. 22, 2020), https://www.washingtonpost.com/nation/2020/08/22/portland-police-far-right-protest.

[4] *4 Stabbed, 33 Arrested After Trump Supporters, Counterprotesters Clash In D.C.*, NPR (Dec. 12, 2020), https://www.npr.org/2020/12/12/945825924/trump-supporters-arrive-in-washington-once-again-for-a-million-maga-march; *Multiple people stabbed after thousands gather for pro-Trump demonstrations in Washington*, THE WASHINGTON POST (Dec. 12, 2020), https://www.washingtonpost.com/local/trump-dc-rally-maga/2020/12/11/8b5af818-3bdb-11eb-bc68-96af0daae728_story.html; Aram Roston, *American Antifa*, REUTERS (Aug. 25, 2021), https://www.reuters.com/investigates/special-report/usa-antifa-profile.

[5] Audrey McNamara, *Thousands gather in Washington D.C. to show support for Trump*, CBS (Dec. 13, 2020), https://www.cbsnews.com/news/trump-supporters-gather-washington-dc-million-maga-march.



we know, the Kansas City Proud Boys were therefore expecting a similar confrontation with BLM and Antifa.[6]

For Christopher Kuehne, his understanding of BLM and Antifa was based on the events around the country starting in May of 2020 when these groups began harassing conservatives and burning down cities after protests throughout the country.[7] He was aware of the dozens of deaths, assaults on police, and destruction done to U.S. cities, including the actions of the group in D.C.[8] Mr. Kuehne's expectations for January 6 did not include anything specific to the Capitol; his expectations were confrontations with BLM and Antifa.[9]

On January 4, Chris traveled from Kansas to Arlington, Virginia, with Proud Boy members in his vehicle.[10] They stayed together in a rented home. On January 6, he came with the

---

[6] *See* ECF No. 198 at *4; *see also* Joshua Zitser, *Far-right group Proud Boys claim they will attend January 6 DC rally 'incognito' and wear all-black to blend in with antifa protesters*, Business Insider (Jan. 3, 2021), https://www.businessinsider.com/proud-boys-attend-january-6-dc-rally-incognito-all-black-2021-1.

[7] See Lois Beckett, *At least 25 Americans were killed during protests and political unrest in 2020*, The Guardian (Oct. 31, 2020), https://www.theguardian.com/world/2020/oct/31/americans-killed-protests-political-unrest-acled; *More Than 2,000 Officers Injured in Summer's Protests and Riots*, Police Magazine (Oct. 31, 2020), https://www.policemag.com/patrol/news/15311242/more-than-2000-officers-injured-in-summers-protests-and-riots; Carol D. Leonnig, *Protesters' breach of temporary fences near White House complex prompted Secret Service to move Trump to secure bunker*, The Washington Post (Jun. 3, 2020), https://www.washingtonpost.com/politics/secret-service-moved-trump-to-secure-bunker-friday-after-protesters-breached-temporary-fences-near-white-house-complex/2020/06/03/e4ae77c2-a5b9-11ea-b619-3f9133bbb482_story.html.

[8] Masood Farivar, *Antifa Protester Implicated in Killing of Trump Supporter in Oregon*, VOA News (Sep. 1, 2020), https://www.voanews.com/a/usa_race-america_antifa-protester-implicated-killing-trump-supporter-oregon/6195248.html; *Antifa Attacks a Journalist*, The Wallstreet Journal (Jul. 1, 2019), https://www.wsj.com/articles/antifa-attacks-a-journalist-11562021361; Kyle Swenson, *Black-clad antifa members attack peaceful right-wing demonstrators in Berkeley*, The Washington Post (Aug. 28, 2017), https://www.washingtonpost.com/news/morning-mix/wp/2017/08/28/black-clad-antifa-attack-right-wing-demonstrators-in-berkeley; *see* footnote 2.

[9] *See* ECF No. 198 at *4; *see also* Joshua Zitser, *Far-right group Proud Boys claim they will attend January 6 DC rally 'incognito' and wear all-black to blend in with antifa protesters*, Business Insider (Jan. 3, 2021), https://www.businessinsider.com/proud-boys-attend-january-6-dc-rally-incognito-all-black-2021-1.

[10] Explaining to the group that he needs to ensure compliance with the law as his livelihood depends on his Federal Firearms License, Christopher Kuehne made sure that any firearms taken into his vehicle were properly and legally secured for their trip. Mr. Kuehne's truckbed was equipped with locked storage for his rifle, which held a disassembled cherry-red custom rifle, secured by an additional trigger lock, which Mr. Kuehe used in his work to show off his firearm-building skills. While this item is mentioned in ECF No. 198, the Court needs to know that the travel with this business item was not connected to his plans for Washington D.C., and the rifle remained lawfully in Arlington, Virginia when Mr. Kuehne traveled to Washington D.C. on January 6.



Proud Boys group to Washington, D.C.. Christopher expected their group to be accosted by Antifa, for there to be a potential brawl. Instead, the group from Kansas got to D.C. early in the morning, walked around D.C. with the Trump supporters, and found its way to the lawn of the Capitol.[11] The day then took an unexpected turn.



Those in the front of the crowd pushed the officer line back. Mr. Kuehne followed the crowd into the area previously marked as restricted.

Christopher was initially walking next to co-defendant Louis Enrique Colon. The two men encountered a man lying on the ground, appearing passed out. He was later identified as Benjamin Philips. Chris looked for EMTs and went over to EMTs to attempt to bring them to Mr. Phillips's location, but they would not come with him. He

---

[11] Christopher was wearing khaki pants, a washed-out black fleece, and a khaki helmet marked horizontally with orange tape. To the back of his backpack were attached two rolls of orange tape, which he was asked to purchase by Louis Enrique Colon. *See* ECF No. 143 at *4. The purpose of the orange tape, per Mr. Colon, was to distinguish the members of this group from Antifa. *Id.*

went back to the man on the ground. On their own, Mr. Kuehne and Mr. Colon tried to help by putting Mr. Philips atop a flat fence that was on the ground. A woman started giving him CPR before the EMTs arrived and took over. Mr. Philips was later pronounced dead.

Mr. Colon and Mr. Kuehne found themselves standing next to a Kansas City Proud Boy who had identified himself to this Court as "Aaron" in the trial of *United States v. Nordean,* and

who was revealed during his testimony to have been a federal informant.[12] Chris started voicing his concerns for the safety of the property inside the historic building as the people were aggressively making their way into the building. "People started pushing into there and you could hear people literally saying, 'we're gonna-- we're gonna fuck this place up, this is our house, we're gonna take all this shit back,' we're gonna do this, that and this… so I said, 'Hey, man, I'm gonna go in there,'" Chris recalled to the FBI during his interview following arrest. The men decided to go into the building together to help safeguard the property.

"Aaron's" statement to his FBI handler corroborates this intent for Mr. Kuehne's entry. *See* Defense Exhibit 2, *Redacted*.

To get into the building, they passed by a line of Capitol Police officers, who neither stopped them nor interacted with them. "Aaron" put his hands on Mr. Kuehene's backpack and helped push him forward as they walked near the uninterested officers.[13]

_____

[12] "Aaron" was dressed in a camouflage-print ballistic vest and brought with him a ballistic helmet with the orange tape designation.

[13] The publicly-sourced video is available at https://medvinlaw.com/wp-content/uploads/2024/02/Aaron-and-Kuehne-Walking-Past-Officers.mov







"Aaron" and Christopher waited in line, and entered the Capitol Building through an open door at 2:25 PM, following a large group of protesters. Mr. Kuehne trailed a few feet behind "Aaron" at all times material, with Mr. Colon not far behind.

Inside the Capitol Building, there was chaos, but Mr. Kuehne kept interacting with his cell phone and looking down. At 2:29 PM, the men arrived in front of a metal gate that was being closed. While Christopher was looking at his phone, "Aaron" was a few feet ahead and moving



forward. "Aaron" ended up retrieving a podium to place underneath a metal gate that was closing

downwards.[14]

  



"Aaron" asked Christopher to assist in moving it, which Chris did after putting down his phone. The two men placed it underneath the metal gate, which Capitol officers were trying to close moments prior. "Aaron" later explained to his FBI handlers that the reason to move the podium was to prevent rioters from tearing it down and using the metal pieces of the gate as weapons.

---

[14] Slowed-motion CCTV video of gate incident available at: https://medvinlaw.com/wp-content/uploads/2024/02/Kuehne-Gate-Podium-Slow.mov

Christopher observed that protesters were making a mess, some taking property and one even smoking a joint. Christopher started directing people to clean up the trash. He also helped to collect trash.[15]

"Aaron" was asked by the FBI what Christopher Kuehne did inside of the Capitol, to which "Aaron" responded — "He made people pick up trash. And he helped de-escalate the standoff with cops." *See* Defense Exhibit 3, *Redacted*.

NBC reporter Ryan Reilly even joked that Christopher's cleanup efforts were like "full dad mode."[16]



A bodyworn camera recorded "Aaron" telling a police officer inside the Capitol Building that the Proud Boys got the crowd to listen and to stand down against the cops. The officer responds with "I appreciate that."



Ryan J. Reilly
@ryanjreilly

This guy goes into full dad mode like he's cleaning up after an Oathkeeper sleepover or something.

Chris also stopped an individual from breaking items inside the Capitol. "This might be your house, but you need to get the fuck out! You need not to destroy shit and you need not to

---

[15] CCTV video of Chris Kuehne cleaning trash available at: https://medvinlaw.com/wp-content/uploads/2024/02/Kuehne-Cleaning-Trash-Capitol-January-6.mov

TikTok Video recording of Christopher Kuehne cleaning Capitol is available here: https://medvinlaw.com/wp-content/uploads/2024/02/January-6-Kuehne-cleaning-Capitol-TikTok-Video.mp4

[16] Ryan J. Reilly (@ryanjreilly), X/Twitter (Jun. 2, 2022, 10:24 AM), https://twitter.com/ryanjreilly/status/1532005111672848385.



take shit," he recalled yelling at the protesters during his post-arrest interview with the FBI. Mr. Kuehne then stopped a man from smoking marijuana inside one of the offices of the Capitol Building. "There's a dude smokin' a joint right on that couch. So, as you walk into that office, there's a table and on the left-- I think it was a blue couch-- he's smoking a joint! I was like, 'Get the fuck out! Now! Get the fuck out!' Said, 'Fuck you, get the fuck out,'" he revealed to the FBI after his arrest.[17]

Chris Kuehne communicated with a few officers in an attempt to figure out how to help them clear the crowd out of the building. Christopher genuinely wanted to assist. After being asked to exit the building following the shooting of Ashli Babbitt, he did so— and uneventfully exited the building.

While Christopher's presence inside the building was unlawful and contributed to the overall chaos of the day, it also mitigated the conduct of at least some of the others and provided at least some assistive benefit to the government as well — a level-headed member of the crowd was telling people to curb their enthusiasm and to stop trashing a national building.

After January 6, he entirely disassociated from the Proud Boys and asked them to delete their communications with him. He wanted to have nothing to do with them anymore.

A few weeks later, when a member of the Kansas City chapter of the Proud Boys asked for Christopher to safeguard some of his firearms, Mr. Kuehne categorically refused.

On February 11, 2021, Mr. Kuehne was arrested by the FBI. That is the date on which Mr. Kuehne made his statements to the FBI describing his activity and intents inside the Capitol.

---

[17] After reviewing court pleadings with his counsel in preparation for sentencing, Mr. Kuehne identified Louis Michael Ciampi, Jr. of Case No. 1:23-cr-00259-TJK, as the individual whom he yelled at for smoking marijuana. *See United States v. Ciampi*, 1:23-cr-00259-TJK, ECF No. 16, *7 (D.D.C. Nov. 21, 2023).

### III. SENTENCING GUIDELINES

As then-Judge Gorsuch once stated, the purpose of sentencing is to "wisely weigh things that cannot be easily weighed." *United States v. Sabillon-Umana*, 772 F. 3d 1328, 1330 (10th Cir. 2014).

> How much punishment is enough to protect the public? To deter future wrongdoing? To reflect the gravity of the offense? And how much punishment suffices to accomplish all these things without verging on cold revenge or needless retribution? …our system depends, as perhaps it must, on the discretion of thoughtful judges.

*Id*.

The first step of this monumental task is to determine the applicable advisory Sentencing Guidelines. *Gall v. United States*, 128 S.Ct. 586, 590 (2007) ("Guidelines are the starting point and initial benchmark but are not the only consideration"). From there, a judge must "tailor every sentence to the case and defendant at hand." *Sabillon-Umana*, 772 F. 3d at 1330. A judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Gall,* 128 S. Ct. at 597. The judge must carefully weigh each of the 18 U.S.C. § 3553(a) factors to determine whether they support the sentence argued for by each party. *Id*. at 596-97. The final sentence ordered by the Court "must… promote the perception of fair sentencing." *Id*. at 597.

An appropriate sentence is defined by Congress as one that is "sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)]." *See* 18 U.S.C. § 3553.

## A) Computing the Guidelines Sentencing Range

Mr. Kuehne pleaded guilty to a low-grade felony for interfering with law enforcement during a civil disorder under 18 U.S.C. § 231(a)(3). The PSR correctly states the applicable Guidelines and calculates the correct range of penalties for this case. *See* ECF No 234.

Mr. Kuehne's offense level is 10, which is then reduced by 2 points for acceptance of responsibility and by another 2 points for him being a non-violent first-time offender, bringing his total offense level down to 6. Since his criminal history category is I, the guideline imprisonment range is 0 months to 6 months under the Sentencing Guidelines.

Pursuant to 28 U.S.C. § 994(j), because Mr. Kuehne is a first-time offender who has not been convicted of a crime of violence or an otherwise serious offense, the appropriate sentence recommended by Congress is one "other than imprisonment." While this was reflected in the former Guidelines, under U.S.S.G. §5C1.1 n.4 (amended on November 1, 2023), the new U.S.S.G. § 4C1.1, which replaced §5C1.1 n.4 in November of this year, fails to note the intent of Congress as required by 28 U.S.C. § 994(j). Accordingly, the new combination of U.S.S.G. §§ 4C1.1 and 5C1.1 falls short of the intent of Congress announced in 28 U.S.C. § 994(j) because the combination of these sections fails to explicitly call for a first-time offender who has not been convicted of a crime of violence or an otherwise serious offense to serve a sentence "other than imprisonment" — an explicit intent of Congress.[18]

---

[18] Note on new amendment: "In 2018, the Commission added a new application note to the Commentary to §5C1.1 (Imposition of a Term of Imprisonment), stating that if a defendant is a 'nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment.' (See USSG App. C, amendment 801.) In 2023, the Commission added a new Chapter Four guideline, at §4C1.1 (Adjustment for Certain Zero-Point Offenders), providing a decrease of 2 levels from the offense level determined under Chapters Two and Three for 'zero-point' offenders who meet certain criteria. In addition, the Commission further amended the Commentary to §5C1.1 to address the alternatives to incarceration available to 'zero-point' offenders by revising the application note in §5C1.1 that addressed 'nonviolent first offenders' to focus on 'zero-point' offenders. (See USSG App. C, amendment 821.)"
Available at https://guidelines.ussc.gov/apex/r/ussc_apex/guidelinesapp/appendixc-detail?APP_AMEND_ID=821



The facts of Mr. Kuehne's case, as well as the mitigating background evidence, his character, and his post-arrest efforts at self-improvement, have nonetheless resulted in the United States Probation Office recommending that Mr. Kuehne be sentenced to a term of probation, as opposed to incarceration, as well as a fine. The recommendation of the Probation Office is consistent with 28 U.S.C. § 994(j). Specifically, the Probation Officer recommended probation for five years and a fine in the amount of $2,000.

The Defense does not dispute the appropriateness of a fine and leaves the amount of the fine — if any— to the Court's discretion. However, the Defense believes that the recommended length of probation is greater than necessary to achieve the aims of sentencing.

The Defense believes that a sentence of *one year of probation* is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a), and within the limitations placed on this Court by Congress and the Eighth Amendment.

The seven factors for this court to consider under 18 U.S.C. § 3553(a) are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant [*discussed supra*]

(2) the need for the sentence imposed to reflect the four primary purposes of sentencing, i.e., retribution, deterrence, incapacitation, and rehabilitation [*discussed infra*]

(3) the kinds of sentences available (e.g., whether probation is prohibited or a mandatory minimum term of imprisonment is required by statute)

(4) the sentencing range established through the application of the sentencing guidelines and the types of sentences available under the guidelines

(5) any relevant "policy statements" promulgated by the Sentencing Commission

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar *conduct* [*discussed supra*]

(7) the need to provide restitution to any victims of the offense [*discussed supra*]

## B) Sentencing Limitations

While the sentencing court has discretion over imposing an appropriate penalty, Congress has placed limits.

This court's ability to impose an available penalty is limited by 18 U.S.C. §§ 3551 and 3561(a)(3), which deem the two independent penalties of probation and imprisonment as *alternatives* to one another. *See United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023); *United States v. Martin*, 363 F.3d 25, 35 (1st Cir. 2004) ("both § 3551(b) and § 3561 require a district court to choose between probation and imprisonment when imposing its original sentence"). This court only has the power to impose (1) a term of probation, (2) a fine as authorized, **or** (3) a term of imprisonment. "Probation and imprisonment are alternative sentences that cannot generally be combined." *United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023). An exception is carved out in 18 U.S.C. § 3551 for a fine — a fine is explicitly permitted to be tacked to another penalty. No other tacking or conjunctive exceptions are noted in the Code.

Supervised release is the Code's exclusive form of post-confinement monitoring and may only be ordered if a defendant is sentenced to a term of imprisonment. *See* 18 U.S.C. § 3583; *United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023). Supervised release conditions are subject to the mandatory and discretionary conditions outlined by Congress in 18 U.S.C. § 3583.

Probationary conditions that this Court may order are limited to the mandatory and discretionary conditions outlined in 18 U.S.C. § 3563. Imposition of a discretionary condition must be "reasonably related to the factors set forth in section 3553(a)(1) and (a)(2) and to the extent that such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2)." *See* 18 U.S.C. § 3563(b).

Additional limitations on the imposition of a penalty include the underlying justification for the penalty. For example, a term of imprisonment cannot be imposed or lengthened for rehabilitative purposes, see 18 U.S.C. § 3582(a) and 28 U.S.C. § 994(k); and, a sentence upon revocation of supervised release cannot be imposed for retributive purposes, see 18 U.S.C. § 3583(e). *See also Tapia v. United States*, 131 S.Ct. 2382 (2011). An appropriate sentence is defined as "sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)]." *See* 18 U.S.C. § 3553.

Moreover, any sentence imposed by this Court is limited by the Eighth Amendment's restrictions on excessive fines and cruel and unusual punishment.

## IV. Incapacitation, Rehabilitation, Retribution, Restitution, and Deterrence

The main aims of sentencing have been accomplished pre-sentencing in this case.

(A)      *Specific deterrence* has been achieved through the humiliation of the arrest, extensive three-year pretrial supervision with conditions, the process of being publicly shamed in the media for his conduct (with some reports blatantly false), and the plea of guilty to a felony offense from January 6 that will permanently stain Mr. Kuehne's clean record. His extraordinary record of contributions to this country is now permanently marred with a felony conviction.



The experience of being arrested, going through court appearances in two federal jurisdictions, conferences with counsel, public shaming in the media and on social media, constant contact with a probation officer — and federal criminal prosecution in and of itself — as well as the personal tribulations that went along with the stress and the shame, *see* PSR, ECF No. 234 at *13-14 — have created more than what Christopher Kuehne ever needed as specific deterrence. This defendant's guilty plea and statement of acceptance of responsibility solidify the

defendant's permanent understanding of the bounds of the law. Mr. Kuehne has learned a blistering lesson about a fine line that he will not cross again.

Mr Kuehne's statements to probation show both acceptance of responsibility as well as remorse, guilt, understanding, and renewed self-control. *See* ECF No. No 234 at *13-14.

Further specific deterrence is plainly unnecessary for this defendant.

(B)   ***Rehabilitation*** has been achieved through Christopher Kuehne's personal rehabilitative measures as well as medical rehabilitative measures.

After walking away from the people he was with on January 6, Mr. Kuehne channeled all of his daily energy into his education, and while this case has been pending, he achieved a Master's Degree with an inspiring 4.0 GPA. He then enrolled in a second Master's program and currently has a 3.98 GPA. He expects to complete the second Master's Degree at the end of this year.

Mr. Kuehne has also endeavored to increase his mental health therapy.

Moreover, Christopher has, over the last three years, completed an estimated 150 hours of volunteer service with American nonprofits: Wreaths Across America, Flags Across America, Habitat for Humanity, Stars of Horsemanship, Feeding America's Hungry Children, Feed My Starving Children, Queen Creek Veterans Memorial Foundation, Veterans Breakthrough, and Project Wet. Christopher participated in extensive community service as a personal choice and did not even disclose the benevolent deeds to his counsel until recently.



(C)     Three years of continuous pretrial supervision has already served an ***incapacitative*** effect on Mr. Kuehne, a first-time offender.

Mr. Kuehne has been on pretrial supervision with restrictions from this court for a duration of 3 years, a very extensive period of pretrial supervision for a nonviolent offender. He has been perfectly compliant with his restrictions. Pretrial services have served as an effective mode of supervision and ***incapacitation*** for this defendant, rendering additional or more serious incapacitation unwarranted.

Moreover, as a first-time offender, this defendant has the lowest likelihood to re-offend, according to the U.S. Sentencing Commission's research on the recidivism of federal offenders.[19] A first-time offender who has not been convicted of a crime of violence or an otherwise serious offense should receive a sentence "other than imprisonment," according to Congress. *See* 28 U.S.C. 994(j) ("the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense"); *see also former* U.S.S.G. §5C1.1 (comment n.4). Incapacitation in the form of imprisonment simply is incongruent with this case and this particular defendant.

In line with the aims of Congress and the Sentencing Guidelines, the facts of Mr. Kuehne's case and the mitigating evidence, his character, and his post-arrest efforts at self-improvement and his community service, as well as the Guidelines computation, have resulted in the United States Probation Office recommending that Mr. Kuehne not be sentenced to

---

[19] *Recidivism of Federal Offenders Released in 2010*, U.S. SENTENCING COMMISSION (Sep. 30, 2021), https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.

incarceration. Instead, the Probation Office recommended the less-incapacitative option of probation for Mr. Kuehne.

Aside from being excessive, incarceration will also prove medically problematic for Mr. Kuehne when we consider his extensive list of medical conditions, necessary medications, necessary medical appointments, significant and serious mental health issues, and the requirement to sleep connected to a CPAP machine.[20] *See* page 7, *supra*.

Moreover, incarceration would result in Mr. Kuehne, the sole breadwinner for his family, losing his job and rendering him unemployed. And, Mr. Kuehne will be unable to finish the required classes for his Master's Degree that he is currently enrolled in.

Incarceration, therefore, is excessive, unwarranted, and inappropriate in this case.

The less-incapacitative option of a sentence of probation is most fitting. However, it should be enforced minimally with respect to Mr. Kuehne. As argued above, any incapacitation is genuinely unwarranted. Nonetheless, 18 U.S.C. § 3563(b) allows probation to be customized to the special needs of a defendant, giving this court the toolkit with which to balance the needs of the defendant with effective incapacitation. The court may require home detention under 18 U.S.C. § 3563(b)(19); and/or the performance of community service under § 3563(b)(12); and/or the submission to medical, psychiatric, or psychological treatment under § 3563(b)(9); and/or any other condition as the court deems just under § 3563(b)(22). As a medically supportive alternative to incarceration, home detention allows defendants to continue medical treatment while still being incapacitated. *See* 18 U.S.C. § 3563(b)(9). While home detention is

---

[20] The most recent BOP guidance on CPAP machines promotes the personal protection interests of BOP employees at the expense of the medical needs of the inmates. The concerns outlined are related to the higher risk of the spread of COVID-19 through use of the machines. *See* https://www.bop.gov/foia/docs//COVIDAerosolGuidanceMay8.pdf

incapacitative, it would still permit a defendant to continue working and would generally not result in the loss of employment. *See* 18 U.S.C. § 3563(b)(19). Moreover, in Mr. Kuehne's case, it would also not hinder his ability to finish his Master's Degree.

18 U.S.C. § 3553(a)(2)(D) specifically directs this Court "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Considering Mr. Kuehne's medical and educational needs, probation is the most appropriate mode of incapacitation.

Accordingly, probation for a period of one year would be a fair and appropriate penalty in this case.

(D)    ***Restitution*** is not a concern in this case. Pursuant to his plea deal, Mr. Kuehne has agreed to pay restitution in the amount of $2,000 upon sentencing. He has pre-paid the restitution in full in advance of his sentencing, in a showing of good faith. *See* Defense Exhibit 4, *Receipt*. He did so  *despite* the fact that he did not break anything or damage any property inside the building; *instead, he endeavored the opposite and tried to clean and prevent damage to the Capitol*. He stopped theft, stopped the smoking of marijuana inside the Capitol, cleaned up trash, and yelled at others to clean their trash.

(E)      In observing the arrests, pretrial restrictions and confinements, and relentless prosecution of January 6 participants through the meticulous reporting of the mainstream media, the public has been provided with more than sufficient ***general deterrence***. Hundreds of thousands of news articles have been published about the arrests and prosecutions of January 6 defendants and numerous congressional hearings related to January 6 have taken place. Donald Trump himself has been indicted and is being prosecuted for his role in the events of January 6. On top of that, the DOJ has created unique public-shaming web pages for every January 6 defendant, a digital version of tar and feathering.[21] The public has been put on clear notice that transgressions against the Capitol or the operation of the Federal Government will not be tolerated.

Conservatives and Trump supporters have been uniquely deterred as political groups— having grown genuinely frightened by engaging in any protest against the Federal Government, a much deeper (and more troubling) general deterrence than is called for by our standard understanding of penal law. For example, when a protest was organized in support of improving detention conditions for January 6 arrestees in September of 2021, only about 100 people arrived to protest, with police and media vastly outnumbering the protesters.[22] When Donald Trump was called into this courthouse for his initial appearance in August of 2023, protesters were difficult to find.[23] "[O]nly around a dozen supporters of the former president were outside the courthouse," reported Politico.[24]

---

[21] Mr. Kuehne's devoted, personal DOJ web page can be found here: https://www.justice.gov/usao-dc/defendants/kuehne-christopher.

[22] *Police outnumber protesters at right-wing Capitol rally*, BBC NEWS (Sep. 19, 2021), https://www.bbc.com/news/world-us-canada-58612965.

[23] Kyle Cheney (@kyledcheney), Twitter (Aug 3, 2023, 8:05 AM), https://twitter.com/kyledcheney/status/1687072114359103488.

[24] Andrew Zhang, *Subdued crowd gathers outside Washington courthouse where Trump was arraigned*, POLITICO (Aug. 3, 2023), https://www.politico.com/news/2023/08/03/trump-indictment-courthouse-arraignment-00109643.

Other political groups have also been deterred from staging protests by the January 6 arrests. The Virginia militia chapter leader of the "Boogaloo" movement (A.K.A. "Virginia Knights" and "Last Sons of Liberty") stated in a recorded video interview on August 18, 2023: "I haven't done any protests since January 6, 2021."[25]

Accordingly, the DOJ has already achieved general deterrence through its unprecedented, unyielding prosecution of all defendants, no matter the magnitude of involvement, top to bottom — from the former President of the United States himself to individuals who briefly trespassed.

(F)   ***Retribution*** in this case has also been accomplished before the imposition of sentence — by the general public contributing significantly to the arrest of the individuals photographed inside the Capitol.[26]

A substantial portion of the January 6 defendants have been identified and brought to FBI attention through "crowdsourcing" with the public's assistance.[27] Civilian groups such as *Sedition Hunters* have formed to identify and report those who were involved.[28] Friends, coworkers, and even family members have reported a substantial portion of January 6

---

[25] Ford Fischer (@FordFischer), Twitter (Aug 18, 2023, 11:32 PM), https://twitter.com/FordFischer/status/1692741297717535039.

[26] Phil Rogers, '*Sedition Hunters' Seek to Identify Participants in Jan. 6 Capitol Attack,* NBC CHICAGO (11/24/2021), https://www.nbcchicago.com/investigations/sedition-hunters-seek-to-identify-participants-in-jan-6-capitol-attack/2693284; Sukrit Venkatagiri, Tianjiao Yu, Vikram Mohanty, and Kurt Luther, *Sedition Hunters: A Quantitative Study of the Crowdsourced Investigation into the 2021 U.S. Capitol Attack,* WWW '23: PROCEEDINGS OF THE ACM WEB CONFERENCE 2023 (April 2023), https://dl.acm.org/doi/pdf/10.1145/3543507.3583514.

[27] *Researchers study the crowdsourced investigation of Jan. 6, 2021,* VIRGINIA TECH (May 3, 2023), https://liberalarts.vt.edu/news/articles/2023/05/liberalarts-crowdsourced-investigation-study.html.

[28] Will Carless, *After Jan. 6 riot, hundreds of identifiable people remain free. FBI arrests could take years*, USA TODAY (Mar. 2, 2023), https://www.usatoday.com/story/news/nation/2023/03/02/sedition-hunters-hundreds-jan-6-rioters-pending-fbi-arrests/11283885002.



participants.[29] The FBI, in turn, has provided a sense of retributive satisfaction to those who assisted law enforcement by arresting the identified individuals, no matter the extent of their role on January 6. Retribution, accordingly, had been accomplished through the public's partnership with the FBI and the DOJ— and the arrests and prosecutions that followed.

_____

Therefore, each of the aims of sentencing — rehabilitation, retribution, restitution, specific deterrence, general deterrence, and even incapacitation — have been met in this case pre-sentencing.

---

[29] Hannah Knowles and Paulina Villegas, *Pushed to the edge by the Capitol riot, people are reporting their family and friends to the FBI*, THE WASHINGTON POST (Jan. 16, 2021), https://www.washingtonpost.com/nation/2021/01/16/capitol-riot-family-fbi; Cassidy McDonald, *Dozens of Capitol rioters were turned in by childhood friends, family members, colleagues and ex-lovers who watched them storm the building*, CBS NEWS (Mar. 9, 2021), https://www.cbsnews.com/news/capitol-riot-arrests-friends-turned-in.

## V. Avoiding Sentencing Disparities

According to the Government, January 6 cases are incomparable to preceding criminal cases and thus exempt from fair comparison with any cases that are not January 6 cases. As such, the Government seeks a disproportionately high sentence for all January 6 participants, including ones convicted of nonviolent offenses. The problem with the Government's proposition is that the Government is responsible for creating the uniqueness of the January 6 prosecutions.

### A) Only One Person Federally Charged for Protest Misconduct in the Capitol Prior to January 6, 2021

Prior to the January 6 prosecutions, only one protester was charged federally for protest misconduct in the Capitol — *only one* — Tighe Barry. *See United States v. Tighe Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018). Mr. Barry was charged under 40 U.S.C. §§ 5104(e)(2)(D) and (G), which are class B misdemeanor petty offenses for disorderly conduct and parading in a Capitol building. Yet when he was initially arrested and charged under the local D.C. Code, Mr. Barry was charged with the more serious offenses of Resisting Arrest and Disorderly Conduct. *See* D.C. Superior Court Docket No. 2018 CMD 013221. Those charges were inexplicably dropped, however, and the conduct was not prosecuted at all.

On September 6, 2018, in the public viewing area for the Senate Judiciary Committee hearing for Brett Kavanaugh, Mr. Barry pulled out a large sign with political writing, stood on top of a chair, and shouted something political. As Capitol Police approached him, he leaped

forward and pushed a chair into a person who happened to have been sitting in front of him. *Barry,* 1:18-mj-00111-RMM, ECF No. 34 (D.D.C. October 11, 2019). Mr. Barry "had to be carried by his arms and legs out of the committee hearing room while he continued his demonstration." *Id.* At the time, Mr. Barry had <u>14 prior arrests</u> on his record for similarly disruptive behavior. *Id.*



Tighe Barry was the very first person — ever— who was federally charged for protest or disruptive behavior at the Capitol. *Barry,* 1:18-mj-00111-RMM, ECF No. 10 ("Notably, no other person charged with protest and/or disruptive-type behavior at the U.S. Capitol Grounds has been previously charged in federal court for the District of Columbia."). And, as mentioned initially, his federal charges did not encompass the full scope of his conduct, such as assault and resisting arrest.

Mr. Barry was one of 1,188 Kavanaugh protesters arrested in 2018 for misconduct during the Senate confirmation hearings for Justice Brett Kavanaugh[30] — constitutionally-mandated proceedings, of note. Other than Mr. Barry, 1,179 Kavanaugh protesters had their criminal charges dismissed without even needing to go to court. *See Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018). This is because the Kavanaugh protesters were charged

---

[30] Amanda Becker, *Hundreds arrested in multi-day protests of U.S. Supreme Court nominee,* REUTERS (Sept. 7, 2018), https://www.reuters.com/article/usa-court-protests/hundreds-arrested-in-multi-day-protests-of-u-s-supreme-court-nominee-idINKCN1LN2K6; Cheyenne Haslett, *Kavanaugh protests escalate, over 120 arrested on Capitol Hill,* ABC NEWS (Sep. 24, 2018), https://abcnews.go.com/Politics/kavanaugh-protests-escalate-120-arrested-capitol-hill/story?id=58048599; *Natalie Delgadillo, Update: Capitol Police Have Arrested More Than 200 Protesters At Kavanaugh Hearings,* DCist (Sept. 4, 2021), https://dcist.com/story/18/09/04/kavanaugh-hearing-arrests.

under the local D.C. code, and their charges were dismissed under D.C.'s "post and forfeit disposition." For comparison, the Capitol protest arrest number is about the same— 1,265 people have been arrested for January 6 offenses.[31] They were all charged federally; none of the January 6 charges have been dismissed pursuant to a leniency disposition.

Sandra Steingraber was one of the Kavanaugh protesters arrested in 2018 in the Gallery for disrupting the Senate proceedings. She was arrested by Capitol Police but charged under the local DC code for the offense of "Crowding, Obstructing, or Incommoding" under the Code of the District of Columbia § 22–1307, which penalizes the act of engaging "in a demonstration in an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a



---

[31] Press release, *Three Years Since the Jan. 6 Attack on the Capitol*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (Jan. 6, 2024), https://www.justice.gov/usao-dc/36-months-jan-6-attack-capitol-0.

demonstration."[32] The DOJ chose not to get involved and not to charge the federal variation of this offense. As such, the case was dismissed as soon as she paid a $50 fine.

Ms. Steingarber was able to obtain this favorable outcome without counsel under DC's "post-and-forfeiture" procedure, which is a streamlined dismissal for a person charged with certain misdemeanor offenses that allows a defendant to post and simultaneously forfeit a particular sum of money, thereby obtaining a full and final resolution of the criminal charge. Moreover, a "post and forfeit" is not an admission or adjudication of guilt.

Ms. Steingraber later bragged about her disruption of Senate proceedings on Twitter.[33] Unlike its interest in the public statements of, and social media usage of, the January 6th defendants, the DOJ was uninterested in either the social media use or the post-arrest statements of the Kavanaugh protesters.

Importantly, this was not Ms. Steingraber's first charge or arrest— she had at least one prior arrest in DC at the time, according to DC court records— and for the same conduct. Ms. Steingraber was actually one of 503 people who were repeat offenders and who received a "post and forfeit" disposition. *See United States v. Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018).

Mr. Kuehne, by direct comparison to Ms. Steingraber, did not enter the Senate Gallery when he was in the Capitol, he stayed in the hallways. Unlike Ms. Steingraber, Mr. Kuehne had not planned to commit an offense against the government ahead of time. Unlike Ms. Steingraber,

---

[32] Compare with the code section the FBI charged every January 6 participant who entered the Capitol, 40 U.S.C. §5104(e)(2)(G), which makes it unlawful to willfully and knowingly "parade, demonstrate, or picket in any of the Capitol Buildings." And, a mirror version of this law appears under D.C. Code § 10–503.16(b)(7), which also makes it unlawful to willfully and knowingly "parade, demonstrate, or picket within any of the Capitol Buildings."

[33] Following her arrest, Ms. Steingraber tweeted: "I was one of the women in the Senate gallery who disrupted the vote. Everything about the process leading up to that vote seemed illegitimate." Sandra Steingraber (@ssteingraber1), Twitter (Oct. 7, 2018, 12:55 PM), https://twitter.com/ssteingraber1/status/1048980210211872769.



Mr. Kuehne did not directly interrupt Senate proceedings — the Senate recessed before Mr. Kuehne entered the Capitol. And, unlike Ms. Steingraber, Mr. Kuehne did not publicly post plans to commit a crime prior to walking into the Capitol.[34] Moreover, Mr. Kuehne had a clean record walking in, unlike Ms. Steingraber.

And, Mr. Kuehne is not like Mr. Barry. He didn't personally interrupt an active session of Congress (both the House and Senate were recessed when Mr. Kuehne walked into the Capitol), he didn't hurt anyone, and he didn't resist arrest. Mr. Kuehne had a clean record and no preexisting intention to walk into the Capitol. Mr. Kuehne didn't need to be carried out of the Capitol by his arms and legs. Yet, even though Mr. Kuehne's conduct is more comparable to the other 1,179 Kavanaugh protesters who were arrested under the local DC code and given the "post and forfeit" dispositions, Mr. Kuehne was prosecuted more aggressively than the lone standout from the Kavanaugh protesters who assaulted a person in the Senate and had a long history of prior arrests.

In 2021, Mr. Kuehne's defense counsel made numerous requests for dismissal dispositions for her January 6 clients in hopes of receiving an outcome comparable to that of the Kavanaugh arrestees. The DOJ, however, made it clear that the diversion programs, which are touted on the U.S. Attorney's website as "enhancing a fair and efficient criminal justice system," will not be offered to any January 6 participant, even though the DOJ also advertises that,

---

[34] Following her arrest, Ms. Steingraber tweeted: "I was one of the women in the Senate gallery who disrupted the vote. Everything about the process leading up to that vote seemed illegitimate." Sandra Steingraber (@ssteingraber1), Twitter (Oct. 7, 2018, 12:55 PM), https://twitter.com/ssteingraber1/status/1048980210211872769. Two years later, she tweeted: "Woke up thinking about the day Brett Kavanaugh was confirmed by the Senate and 13 women stood up in the gallery, 1 by 1, to disrupt the vote and were arrested and media reported they were screaming but actually they were making statements about sexual assault. I was one of them." Sandra Steingraber (@ssteingraber1), Twitter (Nov. 3, 2020, 8:31 AM), https://twitter.com/ssteingraber1/status/1323618700457627650. According to D.C. Superior Court online records, Ms. Steingraber has been arrested two additional times after the Kavanaugh incident, for the same type of charge, and it has been identically disposed of under the post-and-forfeit disposition.

"[e]ach case is subject to individualized review for appropriate disposition."[35] Individuals who happen to be January 6 participants need not apply. *But see United States v. Judd*, 1:21-cr-40, ECF No. 203 (D.D.C. December 28, 2021) (detailing dismissal dispositions for left-wing protest cases, even *felony* charges, in Portland, Oregon).

### B) DOJ Approach to 2020 Political Riot Cases

The BLM political riots of 2020, which preceded the January 6, 2021 Capitol incident by a few months, show a glaring disparity in DOJ treatment of similarly situated defendants.[36] Although the DOJ had jurisdiction to charge — around 300 individuals were charged by the DOJ (this is a total number from 29 states and Washington, D.C.) — only the violent or serious offenders were pursued. Charges included attempted murder, arson, burglary, assaulting law enforcement, damaging federal property, malicious destruction of property using fire or explosives, felon in possession of a firearm and ammunition, possession of a destructive device, and serious cases of civil disorder.[37] Unlike its relentless dedication to convict January 6 participants, the DOJ decided to dismiss many of the violent charges against BLM protesters, including charges of assaults on law enforcement.[38]

---

[35] *Diversion Programs*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (Mar. 3, 2021), originally at https://www.justice.gov/usao-dc/diversion-programs and now archived at https://web.archive.org/web/20210321043921/https://www.justice.gov/usao-dc/diversion-programs.

[36] Available video footage of the 2020 riots has been collected and stored at https://riotarchive.com.

[37] Press Release, *Over 300 People Facing Federal Charges For Crimes Committed During Nationwide Demonstrations*, DOJ (Sep. 24, 2020), https://www.justice.gov/opa/pr/over-300-people-facing-federal-charges-crimes-committed-during-nationwide-demonstrations.

[38] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL (May 4, 2021), https://www.dailymail.co.uk/news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.



### i. **Portland, Oregon**



In Portland, Oregon, the federal courthouse — along with its police officers, local police department, and surrounding neighborhood— was continuously attacked by left-wing protesters for a sustained period lasting over 100 days.[39] While the federal crimes were deliberate and premeditated, only about 103 individuals were arrested throughout the four-month ordeal, most for arson and serious assaults on police officers.[40] The DOJ put out a press release on the relentless riots, saying: "violence instigated and carried out by Antifa and other similar groups in connection with the rioting is domestic terrorism and will be treated accordingly."[41] Yet, **the overwhelming majority of the riot defendants had their federal charges *dismissed*.**[42] *See*

---

[39] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL (May 4, 2021), https://www.dailymail.co.uk/news/ article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.

[40] Unlike their public searchable list of January 6 prosecutions, the DOJ does not publicize its list of Portland cases. A collection of federal cases can be found by private individuals tracking and archiving publicly-revealed individual case data on AntifaWatch.net. See also *Seventy-four face federal charges from Portland protests*, AP NEWS (Aug. 27, 2020), https://apnews.com/article/1c1901dd9c286794791dacc39b0a6727.

[41] Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, DOJ (May 31, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism.

[42] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL (May 4, 2021), https://www.dailymail.co.uk/ news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html*.; Bradford Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*, FOX NEWS (Dec. 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-assaulting-police-case-dismissed-30-hours-community-service.

*also* Defense Exhibit 5, *Examples of 2020 Riot Case Dismissals in Portland*. These dismissal

decisions were made despite the aforementioned DOJ press release calling the relentless riots

"domestic terrorism."

In what world would it be considered "*justice*" for those who committed numerous

felonious assaults, with injuries, on police officers to receive more lenient treatment than a

Purple Heart recipient who cleaned the Capitol on January 6? Yet that is exactly the word that the

DOJ used when dismissing the case of Joshua

Warner (AKA "Eva"). Warner was arrested

*three separate times* during the 2020 Portland

riots for assaults on police, resisting arrest,

criminal mischief, another assault on police,

etc.[43] Warner was charged under federal law

with civil disorder for "targeting the eyes of

multiple law enforcement officers with a

high-powered laser during an August 8, 2020

riot in North Portland," a DOJ press release



read.[44] Yet, the DOJ did not pursue federal assault charges and dismissed the civil disorder

charge in exchange for just 30 hours of community service, saying it was "in the best interests of

---

[43] Bradford Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*, Fox News (Dec. 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-assaulting-police-case-dismissed-30-hours-community-service.

[44] *Press Release, Beaverton Woman Charged with Civil Disorder After Targeting Police Officers with High-Powered Laser,* United States Attorney's Office District of Oregon (Sep. 3, 2020), https://www.justice.gov/usao-or/pr/beaverton-woman-charged-civil-disorder-after-targeting-police-officers-high-powered-laser.



justice." *United States v. Warner*, Case 3:20-cr-00442-HZ, ECF No. 26 (D. Or. Dec. 21, 2021).[45] Mr. Kuehne did not receive a plea offer for dismissal in exchange for his community service.

This is the same Department of *Justice* that decided that Christopher Kuehne's January 6 participation rendered him ineligible for deferred prosecution and ineligible for a misdemeanor plea deal — even though his conduct on January 6 fell well below the actions of Defendant Warner in Portland and even though American military star Christopher Kuehne gave over 20 years of the highest quality service to this country — not to mention giving away the stability of his mind and his health. The Warner defendant did not serve or suffer for our country.

Even though his conduct was nowhere near the level of the Portland defendant, and he helped to clean up the Capitol, Mr. Kuehne will live out the rest of his life as a convicted felon, while the person who assaulted and seriously endangered the eyesight of multiple police officers in Portland (then came back two additional times after being arrested to commit more crimes) walked away above reproach.

Adding insult to injury, the small handful of individuals who were actually convicted of their federal crimes in Portland received *significant* leniency from the DOJ at sentencing.

For example, after securing a conviction for Kevin Benjamin Weier for the felonious depredation of Government property for the act of **setting fire to the Portland federal courthouse**— a felony offense punishable by up to 10 years in prison, a $250,000 fine, and three years supervised release— the Government filed a five-page, bare-bones sentencing memorandum that asked to sentence the defendant to **a one-year term of probation**. *See United*

---

[45] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.ord.155702/gov.uscourts.ord.155702.26.0.pdf.

*States v. Weier*, Case No. 3:20-cr-00263-IM,

ECF No. 39, *5 (D. Or. Nov. 10, 2021).[46]

This is the sentence that Mr. Kuehne seeks for

his case — a case that involved no destruction

of property, and instead, the evidence shows

Mr. Kuehne cleaning the Capitol.



For perspective, compare the DOJ's request for Mr. Weier to the sentence requested for

January 6 defendant Michael Stepakoff, a rabbi who was convicted of a petty misdemeanor for

walking into the Capitol on January 6, shaking hands with a police officer, thanking him for his

service, and walking out after only 5 minutes inside the building — "14 days in custody followed

by three years' probation, 60 hours of community service and $500 in restitution." *See United

States v. Stepakoff*, 1:21-cr-00096-RC, ECF No. 36, *27 (D.D.C. January 11, 2022).[47] In Mr.

Kuehne's case, the Government has informed the defense that they will be seeking a sentence of

incarceration despite the fact that, unlike Mr. Weier's acts of arson, Mr. Kuehne's conduct

resulted in no injuries and no damage to any property, and did not endanger anyone's life.

Furthermore, Mr. Weier's probation recommendation for a felony arson offense was

agreed to via a plea agreement that <u>did not</u> reserve the right for the DOJ to seek a terrorism

enhancement even though the described activity was deemed terrorism by the Attorney General.

*See* Footnote 41; *United States v. Weier*, Case No. 3:20-cr-00263-IM, ECF No. 35 (D. Or. Aug.

---

[46] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.ord.153765/gov.uscourts.ord.153765.39.0.pdf.

[47] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227275/gov.uscourts.dcd.227275.36.0.pdf.

19, 2021). Yet, all plea offers made to January 6 defendants, even *Class 1 misdemeanor* plea agreements for nonviolent January 6 trespassers, reserved the option for the DOJ to attempt to seek an upward departure for terrorism under U.S.S.G. § 3A1.4, n. 4. *See, e.g.*, *United States v. Kuehne*, Case No. 1:21-cr-160-TJK, ECF No. 197, *4 (D.D.C. Sep. 7, 2023)[48]; *United States v. Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 75, *4 (D.D.C. Oct. 13, 2021).[49]

ii. Seattle, Washington



In Seattle, BLM protests led to similar arson and violence as in Portland — with similar commiseration from the DOJ.

While the destruction in Seattle during the summer riots was extensive, only two defendants were federally charged for their conduct.[50] (Additional riots in Seattle took place in later months and are discussed separately, *infra*).

---

[48] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.228126/gov.uscourts.dcd.228126.197.0.pdf.

[49] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.75.0_1.pdf.

[50] Amy Radil, *These are the people who face criminal charges in Seattle after the protests*, KUOW (Jul. 9, 2020), https://www.kuow.org/stories/who-faces-criminal-charges-related-to-seattle-area-protests-here-s-a-roundup.



The first Government sentencing memorandum filed in the Seattle cases was for a woman charged with felony arson of five police vehicles. The Government memo revealed how the DOJ viewed the progressive BLM protest in Seattle: "an important cause" that "should have been an inspiring event" with an "important message." *See United States v. Channon*, Case No. 2:20-cr-00129-JCC, ECF No. 76 (W.D. Wash. Feb 8, 2022).[51]

The second sentencing memorandum that the Government filed for the Seattle cases was for a man accused of bringing a firearm to the BLM protest with the intent to kill police officers — arrested after throwing a 16-ounce can of beer through the window of a police cruiser and striking an officer in the face. In this memo, the Government described the BLM riot that resulted in millions of dollars in property damage in Seattle as "a peaceful but volatile protest." *See United States v. Parker*, Case No. 2:20-cr-00084-RSM, ECF No. 116 (W.D. Wash. Jun. 2, 2023).[52] (It's almost as if the DOJ chose such language to taunt conservatives, who were outraged at CNN for referring to the arsonous BLM riots in Kenosha, Wisconsin as "firey but



_____

[51] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.wawd.288533/gov.uscourts.wawd.288533.76.0.pdf.

[52] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.wawd.287719/gov.uscourts.wawd.287719.116.0.pdf.

*See also* Katherine Anne Long and Paul Roberts, *Downtown businesses assess damage, weigh reopening after nights of riots, looting and chaos,* THE SEATTLE TIMES (May 31, 2020), https://www.seattletimes.com/business/local-business/downtown-businesses-assess-damage-weigh-reopening-after-nights-of-looting-and-chaos; Claire Sprang, *Seattle To Pay $3.6 Million in Damages to Businesses Over 2020 BLM Riots,* THE WASHINGTON FREE BEACON (Feb. 22, 2023), https://freebeacon.com/democrats/seattle-to-pay-3-6-million-in-damages-to-businesses-over-2020-blm-riots.

mostly peaceful."[53])

In comparison, the rally on January 6 has only been described by the DOJ in sentencing memoranda as "a violent attack" and "a large and violent riot." *See, e.g.*, *United States v. Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 90, *1-2 (D.D.C. March 16, 2022).[54] The Government has never, in any pleading known to undersigned counsel, made any sympathetic statements in commiseration with the underlying non-criminal protest on January 6 outside of the Capitol— a protest that could technically also be described as an "*important cause"* that "*should have been an inspiring event*." The hundreds of thousands of January 6 protesters who came to DC to protest election integrity on January 6 or to support their political candidate, who they earnestly believed had won the 2020 election, and who remained outside the Capitol and broke no laws — were not given any credit by the Government in the way that credit was given by the DOJ to non-criminal protesters in Seattle.[55] January 6 has never been described by any DOJ prosecutor as "*a peaceful but volatile protest,*" even though, under the Government's own logic, it certainly could have received such adoration.

---

[53] *See* Joe Concha, *CNN ridiculed for 'Fiery But Mostly Peaceful' caption with video of burning building in Kenosha*, THE HILL (Aug. 27, 2020), https://thehill.com/homenews/media/513902-cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.

[54] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.90.0.pdf.

[55] See, e.g., Jenni White, *What I Saw At The 'Save America Rally' In Washington, DC On Jan. 6*, The Federalist (Jan. 11, 2021), https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6 ("There were hundreds of thousands of people all standing together peacefully in one spot for more than five hours. A small percentage of this group entered the capitol and perpetrated mayhem while hundreds of thousands were peacefully milling around outside. Video of the event shows other attendees remonstrating with some who broke windows or stood on statues, telling them to stop.").

iii. Minneapolis, Minnesota

Perhaps the most startling disparity of all can be seen in a memorandum filed by the Government in the District of Minnesota, where hundreds of BLM rioters engulfed Minneapolis in flames— burning homes, businesses, and even people.

On May 28, 2020, in the middle of a BLM riot, a convicted felon, who was on probation at the time, set fire to a pawn shop, saying "Fuck this place. We're gonna burn this bitch down." *United States v. Lee*, Case No. 0:20-cr-00168, ECF No. 67, *2 (D. Minn. Nov. 4, 2021).[56]  A 30-year-old man was burned to death in that fire. *Id*. at *3.



In its sentencing memorandum, the **DOJ brazenly excused the homicide**— "[the defendant] appears to have believed that he was, in Dr. King's eloquent words, **engaging in 'the language of the unheard**.'" *Id*. *9. The Government's memo does not resolve the glaring fact that the defendant's words at the time of the offense — "*fuck this place, we're gonna burn this bitch down*" — are entirely inconsistent with his post-arrest explanation related to political expression. Instead, citing Dr. Martin Luther King, Jr., **the DOJ requested *half* of the guidelines sentence for the homicide**. *Id*. *7, 12. As a reminder, this homicide was committed while the defendant was on probation for having committed another felony.

---

[56] Also available at
https://storage.courtlistener.com/recap/gov.uscourts.mnd.189358/gov.uscourts.mnd.189358.67.0_2.pdf.

<u>iv. Washington, D.C.</u>



In May 2020, BLM protesters set fires around the White House, caused the President to retreat to a bunker, and clashed with federal law enforcement for days on end.[57] Depicted on the video released by the Department of the Interior, protesters were pushing police shields, assaulting federal officers, and disobeying orders.[58] CNN televised protesters tugging a protective barrier away from federal officers.[59] None of these individuals were investigated or charged for their conduct. But January 6 defendants who committed the same acts were investigated, arrested, and charged.[60]



On May 31, 2020, then-Attorney General William Barr announced that "*violent radical agitators*" from the BLM protests in D.C. would be investigated and charged.[61] Indeed, the DOJ apprehended and charged individuals for acts of bank robbery, bank burglary, arson at the Supreme Court, Molotov

---

[57] *Secret Service Statement on Pennsylvania Avenue Demonstrations*, UNITED STATES SECRET SERVICE, (May 31 2020), https://www.secretservice.gov/newsroom/releases/2020/05/secret-service-statement-pennsylvania-avenue-demonstrations-0; Shawn McCreesh, *Protests Near White House Spiral Out of Control Again*, THE NEW YORK TIMES (May 31 2020), https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.

[58] Department of the Interior Press Secretary (@DOIPressSec45), Twitter (Jun 24, 2020, 1:53 PM), https://twitter.com/DOIPressSec45/status/1275849473701433345.

[59] Andy Ngô (@MrAndyNgo), Twitter (May 30, 2020, 1:30 AM), https://twitter.com/MrAndyNgo/status/1266602847182786567.

[60] See, e.g., *United States v. DaSilva*, Case No. 1:21-cr-00564, ECF No. 48 (D.D.C. May 19, 2023).

[61] Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, U.S. DEPARTMENT OF JUSTICE (May 31, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism.

cocktail attacks on police, and attacks on the Lincoln Memorial.[62] The January 6 investigation, on the other hand, was not limited to "*violent radical agitators.*" Instead, on January 7, 2021, Christopher Wray announced the investment of the full resources of the FBI into an indiscriminate search of "*those involved*" in January 6 misconduct, irrespective of nonviolence or the severity of an individual's involvement.[63] The result is that two-thirds of the individuals arrested for January 6 participation were charged with only nonviolent conduct— including Mr. Kuehne.[64]





The overt disparity between the Government's choice to only pursue *violent agitators* from left-wing protests, and yet *all individuals* from the January 6 protest, yields an unavoidable conclusion: had a January 6 participant committed certain acts in the middle of a BLM protest he

---

[62] *See United States v. DaSilva*, Case No. 1:21-cr-00564, ECF No. 59, *9 (D.D.C. Jun. 9, 2023).

[63] FBI Press Release, *Director Wray's Statement on Violent Activity at the U.S. Capitol Building* (Jan. 7, 2021), FBI, https://www.fbi.gov/news/press-releases/director-wrays-statement-on-violent-activity-at-the-us-capitol-building-010721.

[64] Press release, *Three Years Since the Jan. 6 Attack on the Capitol*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF COLUMBIA (Jan. 6, 2024), https://www.justice.gov/usao-dc/36-months-jan-6-attack-capitol-0.

would have gotten off scot-free, but because that individual committed such acts in the middle of a Trump protest he was charged. That political discrepancy is very troubling.

v. Disparate Treatment of January 6 Participants

The Government's disparate treatment of the January 6 protesters, as compared to the BLM and Kavanaugh protesters — as well as the Government's cherry-picked view on the righteousness of only certain kinds of political riots — provides much-needed context to the otherwise incomparable arrests and sentencing requests for January 6 defendants. Had the federal government treated all riots in the same manner and prosecuted all rioters in the same manner, this sentencing memo would have been a lot more simplistic. But alas, the DOJ has forced this complexity and the extensive argument.

The DOJ's deliberate omission from federal prosecution of the BLM and Kavanaugh protesters is how the Government justifies the claim that January 6 participants could only be compared to other January 6 participants for purposes of criminal penalty imposition. Indeed, there are almost no nonviolent protest cases to compare to the January 6 defendants. That is because the *DOJ caused this disparity* by *only* having prosecuted nonviolent January 6 defendants — by selection, by choice.

As we learned **from the logic of *Wickard v. Filburn*, 317 U.S. 111 (1942), a deliberate decision *not to do something* can create a legally-significant substantial impact through that inaction**. The discussion *supra* illustrates the Government's clear decision not to prosecute various offenses from other political protests which plagued the country in 2020. But as a result,

an entire class of politically-motivated criminal defendants was omitted from sentencing comparables.

Accordingly, a question can be posed: *does the Government's decision not to charge Kavanaugh protesters under federal law "exert a substantial effect" on the comparable sentencing cases available to this court?* (To borrow phrasing from *Wickard)*. The inevitable answer, as we have explored here, is — yes. *See also United States v. Griffin*, 549 F. Supp. 3d 49, 59 (D.D.C. 2021) ("Disparate charging decisions in similar circumstances may be relevant at sentencing."); *United States v. Sandlin*, 575 F. Supp. 3d 16 (D.D.C. 2021) (citing *Griffin* for the same proposition); *United States v. Judd*, 579 F. Supp. 3d 1 (D.D.C. 2021) (same); *United States v. Robertson*, 588 F. Supp. 3d 114 (D.D.C. 2022) (same); *see also* 18 U.S.C. § 3553(a)(6) (directing judges to compare *conduct* as opposed to charges).

The defendant thus asks this Court to take into consideration the defendant's conduct in the context of the Kavanaugh protests of 2018 and the BLM protests of 2020, and the dispositions for those defendants, in order to render a fair sentence.


## C) Comparison to Other January 6 Defendants

There are no January 6 dispositions that are directly comparable to the conduct of Christopher Kuehne — but some cases can be considered for contextual placement of Mr. Kuehne's January 6 conduct. *See* 18 U.S.C. § 3553(a)(6) (directing judges to compare *conduct* as opposed to charges).

**i. Ryan Ashlock, 1:21-CR-00160-TJK**

Co-defendant Ryan Ashlock, a member of the Kansas City Proud Boys, was sentenced to 70 days of incarceration followed by 12 months of supervised release after he, while at the forefront of the January 6 crowd, tore down fencing that was restricting the perimeter around the Capitol and engaged with Capitol police officers, pushing on the barricades behind which officers stood. *See* ECF No. 169 at *9. He had to be repealed by the officers with pepper spray and a baton to make him cease the misconduct. *Id*. at *9-10. He also stepped on a taser wire in an attempt to prevent police from using the weapon to subdue another January 6 protester. *Id*. at *10. However, Mr. Ashlock never entered the Capitol Building. *Id*.





While the final plea deal is not identical between Mr. Kuehne and Mr. Ashlock (the reason for which was not provided by the DOJ despite repeated attempts by Mr. Kuehne's defense counsel to clarify the glaring disparity), the cases of the two men can be compared since they are co-defendants. Although he entered the Capitol Building, Mr. Kuehne did not engage with police and did not personally breach barricades. He did not need to be repealed with less-

lethal use of police force. In contrast, Mr. Kuehne helped an individual who had appeared

unconscious, helped clean up the Capitol, and stopped individuals from disrespecting the Capitol

Building and government property. Mr. Kuehne's worst conduct is assisting FBI informant

"Aaron" in moving a podium. By direct comparison, Mr. Kuehne's sentence should be

significantly lower than that of Mr. Ashlock.

Mr. Kuehne, with his exceptional background, medical turmoils, and significantly less

egregious conduct on January 6, should have been offered a plea deal similar to, or even better

than, that of Mr. Ashlock. But the DOJ refused; without explanation. While this Court has no

mechanism through which to force equitable plea dealing by the DOJ, this Court can nonetheless

create equity through leniency at sentencing. This mechanism is built in through the Fifth

Amendment's Due Process Clause as well as through this Court's inherent power to uphold

justice, and through 18 U.S.C. § 3553(a)(6) (directing judges to sentence defendants through

comparing *conduct* as opposed to the final charges). *See also United States v. Griffin*, 549 F.

Supp. 3d 49, 59 (D.D.C. 2021).


### ii. Felicia Konold, 1:21-CR-00160-TJK

Co-defendant Felicia Konold, who, like Mr. Kuehne, accompanied the Kansas City Proud

Boys on January 6, was sentenced to 45 days of incarceration followed by 24 months of

supervised release after pushing bike racks against officers while trying to overpower police

guarding the Capitol, vocally berating police and encouraging other protesters to engage with

officers in front of the Capitol, then entering the Capitol Building. *See* ECF No. 239 at *5-7. In

the Building, she attempted to hold up the closing gate with her hands as officers were

attempting to close it, and she challenged and shouted insults at the officers. *Id*. at *7-9 After January 6, Ms. Konold celebrated her participation on social media and in a diary. *Id*. at *9.

Ms. Konold received the same plea deal as Mr. Kuehne.

Aside from Mr. Kuehne's completely differential conduct outside of and within the Capitol Building, Mr. Kuehne did not celebrate his participation. Instead, he disassociated with the group and went back to his normal life at home. Mr. Kuehne was ashamed of his involvement with this group, not proud of it. Although Mr. Kuehne had made choice-word statements prior to January 6, all of those statements had to do with what he expected to happen with Antifa aggressors in the City, not with officers and not connected in any way to a breach of a government building.

Mr. Kuehne's penalty needs to reflect his lower culpability and be less than that of Felicia Konold.

### iii. Cory Konold, 1:21-CR-00160-TJK

Co-defendant Cory Konold, who, like Mr. Kuehne, accompanied the Kansas City Proud Boys, was sentenced to 30 days of incarceration followed by 24 months of supervised release, after he pushed bike racks against officers while trying to overpower police guarding the Capitol and entered the Capitol Building, where he stole a Capitol Police helmet and brought it home as a trophy. *See* ECF No. 239 at *5-9.

Cory  Konold received the same plea deal as Mr. Kuehne.

Mr. Kuehne's conduct on January 6 is opposite to that of Mr. Konold. Instead of attacking officers and stealing, Mr. Kuehne attempted to help officers and stopped rioters from stealing property inside the Capitol Building.

Mr. Kuehne's penalty needs to reflect his lower culpability and be lower than that of Cory Konold.

### iv. Corinne Montoni, 1:23-cr-00195-RCL

Corinne Montoni, a January 6 defendant, was found guilty of civil disorder for entering the Capitol Building and then encouraging the crowd to push back against police officers and also engaging in the collective push against the officers. *United States v. Montoni*, 1:23-cr-00195-RCL, ECF No. 79, *5-10 (D.D.C. Sep. 21, 2023). After being forced to exit the Building, she re-entered the Capitol Building. *Id*. at *10. Ms. Montoni then created a plethora of social media posts describing, celebrating, and defending her conduct. *Id*. at *11-13. She was sentenced by Judge Lamberth to 30 days of incarceration followed by 24 months of supervised release. *United States v. Montoni*, 1:23-cr-00195-RCL, ECF No. 85 (D.D.C. Sep. 28, 2023).

Mr. Kuehne's penalty needs to reflect his lower culpability and be lower than that of Corinne Montoni.

### v. Daryl Johnson, 1:21-cr-00407-DLF

Daryl Johnson, a January 6 defendant, was found guilty of civil disorder for rushing a line of law enforcement officers guarding entry to the Capitol Building and helping push through the officers to push open the East Rotunda doors, allowing protesters outside of the Building to



storm the Capitol. *United States v. Hazelton*, 1:21-cr-00407-DLF, ECF No. 39 (D.D.C. Jan. 4,

2022). Mr. Johnson was sentenced by Judge Friedrich to 30 days of incarceration and 1 year of

supervised release. *United States v. Hazelton*, 1:21-cr-00407-DLF, ECF No. 72 (D.D.C. Jun. 2,

2022).

Mr. Kuehne's penalty needs to reflect his lower culpability and be lower than that of

Daryl Johnson.


### vi. Timothy Allen Hart, 1:21-cr-00540-PLF

Timothy Allen Hart, a January 6 defendant, was found guilty of civil disorder for

breaching police lines and encouraging other protesters to move towards the Capitol, riling them

up with choice language. *United States v. Hart*, 1:21-cr-00540-PLF, ECF No. 69, *8 (D.D.C. Jul.

20, 2023). Mr. Hart then "gestured towards the crowd, waving them onward, and encouraging

them to continue moving closer to Capitol." *Id*. Mr. Hart smoked marijuana inside the Capitol

Building while recording a selfie video to celebrate his misconduct. *Id*. at *12. Judge Friedman

sentenced Mr. Hart to 36 months of probation. *United States v. Hart*, 1:21-cr-00540-PLF, ECF

No. 74 (D.D.C. Aug. 2, 2023).

As mentioned previously, Christopher Kuehne actually stopped an individual from

smoking marijuana inside the Capitol Building, and of course, Mr. Kuehne never encouraged

others to riot or to breach police lines.

Mr. Kuehne's penalty needs to reflect his lower culpability and be lower than that of Mr.

Hart.

### vii. Louis Michael Ciampi, Jr., 1:23-cr-00259-TJK

Louis Michael Ciampi, Jr., a January 6 defendant, was found guilty of unlawful parading in the Capitol after he climbed through a broken window to enter the Capitol (after being cautioned by a friend not to do that), went to a sensitive place within the Capitol, and smoked a marijuana joint in a senator's office. *See United States v. Ciampi*, 1:23-cr-00259-TJK, ECF No. 16 (D.D.C. Nov. 21, 2023). He remained in the Capitol for a total of 40 minutes. *Id*. This court sentenced Mr. Ciampi to a period of 18 months of probation with the special conditions of 60 hours of community service and 60 days of location monitoring. *See United States v. Ciampi*, 1:23-cr-00259-TJK, ECF No. 18 (D.D.C. Nov. 30, 2023).

Mr. Kuehne, who never climbed through a broken window and who felt the need to stop Mr. Ciampi from smoking in the Capitol, should receive a sentence less than that of Mr. Ciampo — one that is commensurate with his lower culpability inside the Capitol Building. *See* Footnote 17.

As discussed *supra*, Mr. Kuehne should have been offered a plea deal similar to that of Mr. Ciampi. But the DOJ refused; without explanation. While this Court has no mechanism through which to force equitable plea dealing by the DOJ, this Court can nonetheless create equity through leniency at sentencing. Although Mr. Kuehne pleaded to a more serious offense, this Court can, and should, endeavor to create equity by sentencing Mr. Kuehne to a lower sentence than that of someone who received a more lenient plea offer. This mechanism is built in through the Fifth Amendment's Due Process Clause as well as through this Court's inherent power to uphold justice, and through 18 U.S.C. § 3553(a)(6) (directing judges to sentence

defendants through comparing *conduct* as opposed to the final charges). *See also United States v. Griffin*, 549 F. Supp. 3d 49, 59 (D.D.C. 2021).

## VI. Appropriate Sentence for this Defendant

Considering Christopher Kuehne's clean record, his age, his outstanding character and service to this country, his medical ailments, his remorse and personal efforts at rehabilitation, and the facts of his case in light of other January 6 cases *and* the Government's position on treatment of the pre-January 6 protest cases, a fair penalty — in addition to the already-imposed penalty of a felony conviction and the 3-year-long pretrial supervision, as well as payment of restitution — is one year of probation.

The sentence proposed by the defense is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a), and within the limitations placed on this Court by Congress and the Eighth Amendment.

Respectfully submitted,
By Counsel:
_____/s/_____
Marina Medvin, Esq.
*Counsel for Defendant*
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

## <u>CERTIFICATE OF SERVICE FOR CM/ECF</u>

   I hereby certify that on February 16, 2024, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

        _____/s/_____

        Marina Medvin, Esq.